**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO (CLEVELAND)**

| | |
|---|---|
| A. PHILIP RANDOLPH INSTITUTE OF OHIO, LEAGUE OF WOMEN VOTERS OF OHIO, OHIO STATE CONFERENCE OF THE NAACP, BEATRICE GRIFFIN, SARAH RIKLEEN, C. ELLEN CONNALLY, MATTHEW NOWLING, RYLLIE JESIONOWSKI, SOLI COLLINS, and MARCUS GERMANY, | CASE  NO. _____ |
| *Plaintiffs*, | |
| v. | |
| FRANK LAROSE, in his official capacity as Secretary of State of Ohio, | |
| *Defendant*. | |

**COMPLAINT**

1.  At a time when the vast majority of Ohio voters are expected to vote absentee by mail this general election because of the COVID-19 pandemic, and the United States Postal Service ("USPS") is experiencing unprecedented delays, Ohio Secretary of State Frank LaRose's directive limiting each Ohio county to a single secure drop box for absentee applications and ballots in the 2020 election unconstitutionally burdens Plaintiffs' right to vote.  Simply put, absent immediate injunctive relief, hundreds of thousands of Ohioans stand to have their votes suppressed because of Defendant LaRose's action depriving Ohioans of a sufficient number of secure drop boxes.

1

2. There is no question as to the impact of Defendant LaRose's action. He has stated unequivocally that "[w]e think more Ohioans will vote by mail than ever before. I think 2020 will be the highest turnout presidential election we've ever seen in our state's history. I think it will be the highest rate of absentee voting and early voting."

3. At the same time, the USPS has implemented system-wide cutbacks that have significantly slowed mail delivery. The USPS warned Ohio that certain of Ohio's "deadlines for requesting and casting mail-in ballots are incongruous with the Postal Service's delivery standards."

4. Ignoring this reality, Defendant LaRose issued Directive 2020-16 ("Directive") providing Ohioans the option to return completed absentee voting applications and voted ballots by placing these documents in a secure drop box located at the voter's office of boards of elections, while at the same time effectively taking that option away by limiting each county to that single secure drop box, regardless of the size or population density of the county. The Directive expressly prohibits Ohio's 88 county boards of elections from installing a secure drop box anywhere other than at the office of the board of elections.

5. Defendant LaRose's Directive substantially burdens Plaintiffs' and their members' constitutional right to vote. It forces them into a Hobson's choice. One the one hand, voters can risk their lives and health by voting in person so that they have more assurance that their ballots will count. On the other hand, voters have the choice to protect their lives and health by attempting to vote absentee while facing the real possibility that their ballots will not count because of an insufficient number of drop boxes and USPS delays in timely delivering absentee balloting mail. This includes, but is not limited to, the delivery of completed ballots to election officials. Defendant's action burdens Plaintiffs and their members who would be precluded from

using a secure drop box because they would have to travel a significant distance and spend a substantial amount of time getting to their county's only secure drop box. It further burdens Plaintiffs and their members who would be precluded altogether from using a secure drop box because they do not have access to a car and live too far from the board of elections to walk there; do not have access to public transportation; or have access to public transportation but that mode of transportation does not provide a practical and/or a safe means during a pandemic for Plaintiffs to get to their board of elections.

6.      The Directive further unlawfully favors voters in counties smaller in population over those counties larger in population, in violation of equal protection of the law. While the Directive substantially burdens all Ohioans, that burden is greater for those who live in more populated counties because only one drop box is available per hundreds of thousands of registered voters in the county. Thus, in larger counties, one secure drop box is insufficient to meet the needs of hundreds of thousands of registered voters in the county.

7.      Thus, the Directive operates as yet another obstacle for voters—who, in the face of a global pandemic that makes in-person voting hazardous, and with uncertainties surrounding the ability of the USPS to timely deliver mail—choose to vote absentee by mail in November.

8.      By restricting the manner in which voters return their absentee ballots, as well as their absentee-ballot applications, and forcing them to mail their election-related materials at a time when USPS experiences massive changes to its core infrastructure and has issued warnings about its ability to deliver election-related materials in a timely manner, Defendant LaRose has burdened and threatened Plaintiffs', Plaintiffs' members, and Ohioans' fundamental right to vote.

9.      The right to vote is a "precious" and "fundamental" political right that is "preservative of all rights." *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966); *Yick*

*Wo v. Hopkins*, 118 U.S. 356, 370 (1886). "Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). The Constitution, therefore, protects both the fact of the franchise itself, and "the manner of its exercise." *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 477 (6th Cir. 2008).

10.     Plaintiffs seek immediate injunctive and declaratory relief before the November 2020 general election and ask this Court to (1) enjoin enforcement of Directive 2020-16 in the November 2020 general election to the extent that it prohibits multiple secure drop boxes per county and (2) order Defendant LaRose to issue guidance to county boards of elections that they may install multiple secure drop boxes in their respective counties or accept a completed absentee application and voted absentee ballot at any polling place in the county in which the voter resides.

## JURISDICTION AND VENUE

11.     Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 to seek redress for Defendant's violations of the First and Fourteenth Amendments to the U.S. Constitution.

12.     This Court has original The matters in controversy arise under the Constitution and laws of the United States. Plaintiffs seek redress for their deprivation under color of law of rights and privileges secured by the Constitution of the United States. Plaintiffs seek to enforce the right of citizens of the United States to vote.

13.     This Court has personal jurisdiction over Defendant LaRose, who is sued in his official capacity as an officer of the State of Ohio.

14.     Venue is proper in this Court under 28 U.S.C. § 1391(b) (2) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

15.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, Federal Rules of Civil Procedure Rules 57 and 65, and the general legal and equitable powers of this Court.

## PARTIES

### A.     Organizational Plaintiffs

### Philip Randolph Institute of Ohio ("Ohio APRI")

16.     Ohio APRI is a state chapter of the A. Philip Randolph Institute ("APRI"), a national organization for African-American trade unionists and community activists. APRI was established in 1965 to forge an alliance between the civil-rights and labor movements. Ohio APRI has eight chapters across Ohio, including in rural and urban parts of the State. APRI has members in Columbus, Cleveland, Cincinnati, Warren, Youngstown, Toledo, Akron, Canton, and Dayton, and in other parts of the State. Ohio APRI's mission includes supporting charitable ventures, such as feeding the hungry and providing clothing to those in need, and conducting voter engagement, such as voter outreach, voter education, and voter registration. The majority of Ohio APRI's resources are dedicated to its voter-engagement work, including get-out-the-vote and election protection in predominantly low-registration and low-turnout neighborhoods. Since the pandemic, Ohio APRI has had to shift its resources to educating members on how to vote absentee. During the March 17 and April 28 primary election, Ohio APRI fielded calls from members on how to vote absentee including how to fill out applications and get their ballots counted.

17.     Ohio APRI has advocated for multiple secure drop boxes since the beginning of the pandemic and since more members have been voting by mail. Ohio APRI leadership has written letters to election officials and issued statements in the media about the utility of secure

drop boxes. Since Defendant LaRose issued Directive 2020-16 banning counties from installing multiple secure drop boxes, Ohio APRI has had to quickly shift its resources to educating membership about Directive 2020-16, speaking with influential pastors in the community about the Directive, and publicly opposing Defendant LaRose's ban. Ohio APRI is now devoting significant time and resources to Zoom video calls and virtual town halls to educate members on the need to request absentee ballots early given USPS delays. Ohio APRI is also fielding calls from members who have shared the difficulties around having to travel to the office of their county board of elections to use a secure drop box to deliver their absentee ballots and ballot applications.

18.     Many Ohio APRI members plan to vote absentee by mail in the upcoming general election. Many Ohio APRI members believe the USPS will not deliver their absentee ballots on time, based on their experiences in the primary election when they received their absentee ballots too late to postmark in time or never received their absentee ballots at all. Many Ohio APRI members cannot vote in person as they are high risk for contracting the coronavirus, and because of Ohio's lack of a clear mask requirement in polling places, which makes voting in person hazardous. Many Ohio APRI members live in predominantly urban cities and do not own cars— they have to rely on public transportation or costly and potentially unsafe ride-sharing services to get to the office of their local board of elections. During a global pandemic, these members cannot and do not want to use public transportation. Many Ohio APRI members own cars but have, in the past, experienced traffic jams and long lines at board of elections offices. Other Ohio APRI members live in less populous counties where the drive time to the board of elections office is substantial. Many Ohio APRI members live in counties that publicly support installing

6

multiple secure drop boxes at accessible and secure locations on municipal or governmental property, but are unable to do so because of Defendant's ban.

19.     But for Directive 2020-16, many Ohio APRI members would drop off their absentee-ballot applications and absentee ballots at secure drop boxes closer to their residences (or, alternatively, with election officials at any polling place in their county, if that option were provided), without having to travel to their board of elections or rely on USPS.

**League of Women Voters of Ohio ("LWVO")**

20.     LWVO is a membership organization affiliated with the League of Women Voters of the United States ("LWVUS").LWVO recruits and develops members and provides support to 33 local leagues in Ohio. LWVUS is a non-partisan peoples' organization that has fought since it was founded in 1920, after the enactment of the Nineteenth Amendment of the U.S. Constitution granting women's suffrage, for the goal of helping citizens exercise their right to vote. In typical election years, LWVO provides many voter services and educational projects, such as conducting voter registration drives, publishing in journals and brochures, holding nonpartisan candidate and issue fora, publishing online electronic voter information and candidate guides, and providing rapid-response emergency support to local leagues in times of crisis, among other activities. LWVO members work with state officials and local county officials to ensure that they are ready for election day and have trained poll workers. LWVO members attend local county election board meetings to watch officials decide whether to accept or reject absentee ballot applications. Before the primary election on March 17 and April 28, LWVO worked directly with local leagues and members to educate the public on Ohio's new process and timeline for casting absentee ballots, ways to avoid mail delays, many issues around prepaid postage, and late postmarks.

21.     LWVO has advocated for multiple secure ballot drop-off boxes since the beginning of the pandemic and since more members have been voting by mail. LWVO leadership has written letters to election officials and issued statements in the media about the utility of secure ballot drop boxes. Since Defendant LaRose issued Directive 2020-16 banning counties from installing multiple secure ballot drop boxes, LWVO has had to quickly shift its resources to educating membership about Directive 2020-16, speaking with other voter advocates and voting rights groups about the Directive and its impact on Ohio's electorate including LWVO's members, and publicly opposing Defendant LaRose's ban. LWVO is now devoting significant time and resources to Zoom video calls and virtual town halls to educate members about why they need to request absentee ballots early given USPS delays, and fielding questions about ways that members can return their absentee ballots without having to rely on the USPS. LWVO is fielding calls from members who have shared the difficulties around having to travel to the office of their county board of elections to use a secure drop box to deliver their absentee ballot applications and absentee ballots.

22.     Many LWVO members plan to absentee by mail in the upcoming general election. Many LWVO members believe that the USPS will not deliver their absentee ballots on time, based on their experiences in the primary election when they received their absentee ballots too late to postmark in time or never received their absentee ballots at all. Many LWVO members will not vote in person because they are high risk for contracting the coronavirus, and because of Ohio's lack of a clear mask requirement at polling places, which makes voting in person hazardous. Although some LWVO members own cars they have, in the past, experienced traffic jams and long lines at boards of elections offices. Other LWVO members live in less populous, rural counties where the drive-time to the local board of elections is significant. Many LWVO members

live in counties that publicly support installing multiple secure ballot drop boxes at accessible and secure locations on municipal or governmental property, but are unable to do so because of Defendant's ban. But for Directive 2020-16, many LWVO members would drop off their applications and absentee ballots at secure drop boxes closer to their residences (or, alternatively, at any polling place in their county, if that option were provided),without having to travel to their board of elections or rely on USPS.

### Ohio State Conference of the NAACP ("Ohio NAACP")

23.     Ohio NAACP is a nonpartisan, multi-racial, non-profit membership organization that serves as an arm of the National Association for the Advancement of Colored People. Ohio NAACP has 38 active adult chapters, college chapters, and youth councils in Ohio. Its mission is to eliminate race-based discrimination through securing political, educational, social, and economic equality rights and ensuring the health and well-being of all persons. Ohio NAACP conducts voter education, engages in voter registration, offers rides through its Souls to Polls program, and conducts election protection and get-out-the-vote activities. Since the pandemic, Ohio NAACP has held Zoom video calls and virtual town halls for its membership and constituents it serves regarding how to absentee by mail in Ohio.

24.     Ohio NAACP has advocated for multiple secure ballot drop boxes since the beginning of the pandemic and since more members have been voting by mail. Ohio NAACP has had to shift its resources to educating membership about Directive 2020-16. Ohio NAACP has fielded calls from concerned chapters in Lucas, Hamilton, and Cuyahoga Counties on Directive 2020-16 in so far as it bans multiple secure drop boxes per county.

25.     A majority of Ohio NAACP members and communities it serves are Black Americans. A majority of Ohio NAACP members are 50 years or older and suffer from

comorbidities that make them at high risk of contracting COVID-19 and contracting it in its severest form. Their only option is to absentee by mail. Many members are skeptical that the USPS will deliver their absentee ballots to boards of elections in a timely fashion. For that reason, they believe that they will be disenfranchised if they mail their ballots. Ohio NAACP has its largest units in more populous cities—Cleveland, Cincinnati, and Columbus, Ohio. Black communities in these cities often live far from the board of elections and do not have cars. Public transportation is the only way for their getting to the board of elections office and using a secure drop box. Ohio NAACP also has active members in less populous cities of Springfield, Wooster, Chillicothe, Ohio, among others. In these cities, Ohio NAACP members live far from their board of elections office and face many of the same transportation issues as members in more populous counties.

### B.    Individual Plaintiffs

26.    Beatrice Griffin is a resident of Shaker Heights, Ohio. She is registered to vote in Cuyahoga County, Ohio. She is an older American above 65 years of age.  Due to the COVID-19 pandemic, given her age and other health circumstances that make her high risk for contracting the virus, in-person voting is not a viable option for Ms. Griffin. The USPS is also not a viable option for Ms. Griffin, because she believes her election-related mailings, including her absentee ballot, will not be delivered to the board of elections on time. The words and actions of the President of the United States and the USPS have irreparably undermined Ms. Griffin's trust that the USPS would deliver her ballot to the board of elections in a timely manner. Ms. Griffin plans to use a secure ballot drop box; but if Cuyahoga County has only one secure ballot drop box located at its board of elections office, her right to vote may be lost, as it would be impossible for her to endure sitting in long traffic lines to vote, and she may be forced to risk the uncertainties

10

of having her ballot delivered by the Postal Service. Under Defendant's Directive, over 850,000

Cuyahoga Countyregistered voters would be afforded only one secure ballot drop box. In the

alternative, Ms. Griffin would be willing to drop off her absentee application and ballot at a

polling place closer to where she lives in the county if she is permitted to do so.

       27.     Sarah Rikleen is a registered voter in Cuyahoga County, Ohio. She has lived in

the Edgewater neighborhood of Cleveland, Ohio, since early 2017 when she moved to join a

residency program at Metro Health Medical Center in Cleveland. She is a fourth-year resident in

internal medicine and pediatrics. She registered to vote in early 2018 and voted for the first time

in Ohio during the 2018 midterm election. Dr. Rikleen has voted in person and by mail in Ohio.

She believes that voting is an important way to participate in democracy. Dr. Rikleen plans to

vote absentee by mail in the upcoming general election. Dr. Rikleen has been seeing patients at

the hospital every day during the pandemic. Dr. Rikleen is responsible for caring for a wide

range of patients, including those diagnosed with COVID-19. Because of her high-risk job as a

health professional, Dr. Rikleen has opted not to vote in person in November 2020. She fears

that, if she votes in person, she may expose fellow voters and election workers to COVID-19

because she cares for COVID-19 infected patients. Dr. Rikleen is concerned that if fellow voters

do not wear masks at the polling place, she may, herself, be infected while voting and may risk

infecting her patients, many of whom have comorbidities and qualify as high risk for

complications. Her schedule is unpredictable and hectic. She does not have time to leave the

hospital to go to her polling place or the board of elections to cast her vote in person. Given that

voting by mail is her only option for casting a ballot for the general election, Dr. Rikleen is

concerned that USPS delays will prevent her from timely receiving and returning multiple

election-related mailings including an absentee application and absentee ballot. Dr. Rikleen does

not want to use the USPS to deliver her application and ballot in such a high stakes election in which she wants to be certain that her vote will count. If she could, Dr. Rikleen would drop off her completed application and voted absentee ballot at a secure ballot drop box at a public library or other municipal building within walking distance of her home. But for Defendant LaRose's Directive, she would have been able to use a secure ballot drop box and return her application and ballot without relying on the USPS because the mayor of Cleveland supports multiple secure ballot drop box locations across the city. In the alternative, she would be comfortable dropping off her absentee application and ballot at a polling place closer to where she lives in the county if she is permitted to do so.

28. C. Ellen Connally is a lifelong resident of the City of Cleveland, Ohio. She is registered to vote in Cuyahoga County, Ohio. She has voted for many years. For most of those years, Judge Connally has voted absentee. Judge Connally considers it her civic duty to vote, especially for this elections cycle. Judge Connally is a lifelong leader in the Black community for Cuyahoga County, Ohio. From 1980 to 2004, Judge Connally served as a Judge of the Cleveland Municipal Court. She wasthe first Black American female elected judge in Ohio without being first appointed. In 2004, she was a candidate for the Supreme Court of Ohio. In 2010, Judge Connally was elected to the newly created Cuyahoga County Council. In 2014, Judge Connally was appointed by Governor John Kasich to the Board of Trustees of the Ohio History Connection. Due to her age and the risks that older Americans face from COVID-19, voting in person for the general election is not a viable option. Judge Connally has significant reservations entrusting her right to vote to the USPS because of widely reported delays in mail deliveries. Judge Connally plans to use a secure ballot drop box; but if Cuyahoga County is denied the ability to place secure ballot drop boxes at locations other than its board of elections office, her

right to vote may be, as it would be impossible for her endure sitting in long traffic lines to vote, and she may be forced to risk the uncertainties of having her ballot delivered by the USPS. Judge Connally would be willing to drop off her absentee ballot at a more accessible location closer to her residence instead of having to drive to the Cuyahoga County board of elections office on Euclid Avenue in Downtown Cleveland. In the alternative, she would be comfortable dropping off her absentee application and ballot at a polling place closer to where she lives in the county if she is permitted to do so.

29.     Matthew Nowling is a qualified voter registered to vote in Franklin County, Ohio. Voting, particularly in the upcoming general election, is critically important to him. Mr. Nowling plans to vote absentee by mail in the upcoming general election. Mr. Nowling has read numerous reports and heard conflicting statements about the USPS's ability to deliver absentee ballots within the timelines required by Ohio statutes. Mr. Nowling does not trust the USPS to timely submit his application and ballot to the Franklin County board of election. Mr. Nowling does not want to vote early in person because he does not want to risk contracting COVID-19, especially given the uncertainty on whether Franklin County will require voters to wear face masks. Mr. Nowling believes that his only effective option is to use a secure ballot drop box. Franklin County has more than 850,000 registered voters and Mr. Nowling believes that there will be long traffic lines and little time to drop off his ballot, if there is only one secure drop box in the county.

30.     Ryllie Jesionowski is a registered voter in Cuyahoga County, Ohio. She believes voting is a civic duty, especially for this upcoming general election. She is not comfortable voting in person, whether early voting or on election day, because there are too many open questions about the safety and health of voting in person during the COVID-19 pandemic. Ms.

Jesionowski plans to vote absentee by mail in the upcoming general election. Ms. Jesionowski does not want to rely on the USPS because she has heard that USPS deliveries are delayed and believes that she may not receive her absentee ballot in time to be able to return it by the deadlines required by Ohio statutes. Transportation to the Cuyahoga County board of elections is problematic and Ms. Jesionowski lives far from Euclid Avenue where the board is located. She also does not have access to a car currently and would have to take public transportation. It would take Ms. Jesionowski as much as an hour each way to the office of the board of eElections on Euclid Avenue. Ms. Jesionowski plans to use a secure ballot drop box; but, if Cuyahoga County is denied a sufficient number of secure ballot drop boxes, her vote would be suppressed, as it would be impossible for her to endure sitting in long traffic lines to vote.

31. Soli Collins is an eligible voter, registered to vote in Cuyahoga County, Ohio. She first registered to vote in 2019. To Ms. Collins, voting is a civic duty, especially for this general election. Ms. Collins does not believe she can rely on the USPS to timely receive and deliver her absentee application and absentee ballot. Ms. Collins has experienced a slowdown in the delivery of her mail. Ms. Collins cannot vote in person because she does not want to expose herself to COVID-19 and is whether adequate precautions will be implemented to ensure the safety and health of voters at the polls including whether face masks are required to vote at the polling place. Ms. Collins would like to drop off her ballot at a secure ballot drop box that is close to where she lives in the county. She does not want to drive for a long period of time to get to the board of elections in downtown Cleveland and sit in long traffic lines, likely for hours, just to drop off her ballot.

32. Marcus Germany is a registered voter in Cuyahoga County, Ohio and a life-long resident of Ohio. He lives in the Lakewood neighborhood of Cleveland, Ohio. He is a resident in

internal medicine and pediatrics at Metro Health Medical Center in Cleveland. Dr. Germany believes that voting is an important way to participate in democracy. He plans to vote absentee by mail in the November 3, 2020 general election. He has been seeing patients at the hospital every day during the pandemic. He is responsible for caring for a wide range of patients, including those diagnosed with COVID-19. Because of his high-risk job as a medical health professional, Dr. Germany cannot reasonably vote in person in the upcoming general election. He fears that if he votes in person, he will expose fellow voters and election workers to COVID-19 because he cares for COVID-19 infected patients. He is also concerned that, if fellow voters do not wear masks at the polling place, he may become infected and may risk infecting his patients, many of whom have comorbidities and qualify as high risk for complications. His schedule is unpredictable and hectic. He does not have time to leave the hospital to go to his polling place or the board of elections office and cast his vote in person. Dr. Germany is concerned that USPS delays will prevent him from timely receiving and returning multiple election-related mailings including an absentee application and ballot. Dr. Germany does not want to use the USPS to mail his application and ballot in such a high-stakes election, in which he wants to be certain that his vote will count. If he could, Dr. Germany would drop off his completed application and absentee ballot at a secure ballot drop box at a public library or other municipal building within walking distance of his home. Dr. Germany lives more than a 20-minute drive (under the best of circumstances) to the Cuyahoga County board of elections and anticipates traffic jams and long lines because there is only one secure drop box in the county. But for Defendant LaRose's Directive, dr. Germany would be able to use a secure ballot drop box and return his application and ballot without relying on the USPS because the mayor of Cleveland supports multiple secure ballot drop box locations across the city. In the alternative, he

would be comfortable dropping off his absentee application and ballot at a polling place closer to

where he lives in the county, if he is permitted to do so.

      **C.**    **Defendant**

    33.    Defendant Frank LaRose is the Secretary of State of Ohio. Defendant is sued

here in his official capacity.  Defendant is the chief elections officer of the State. Ohio Rev. Code

§ 3501.04. As chief elections officer, Defendant is responsible for issuing binding and advisory

guidance to county officials concerning election procedures. Ohio Rev. Code § 3501.05.

Defendant has the authority to promulgate regulations and directives includes the authority to

issue both permanent and temporary directives regarding elections. Ohio Rev. Code § 3501.053;

*see also* Ohio Admin. Code § 111:3-1-01.

    34.    Defendant is also responsible for "[a]ppoint[ing] all members of boards of

election," "[i]ssu[ing[ instructions by directives and advisories [. . .] to members of the boards as

to the proper methods of conducting elections"; "[p]repar[ing] rules and instructions for the

conduct of elections"; "[d]etermin[ing] and prescribe[ing] the forms of ballots"; and

"[c]onduct[ing] voter education." Ohio Rev. Code § 3501.04.

## FACTUAL ALLEGATIONS

    **A.**    **Absentee Voting in the November 3, 2020 General Election**

    35.    For the 2020 elections cycle, Ohio has moved primarily to an absentee vote-by-

mail system. Election officials, including Defendant LaRose have predicted that this upcoming

general election will rely more on absentee vote by mail than any other time in Ohio's history.

    36.    At an Ohio Statehouse briefing, Defendant LaRose noted, "[w]e think more

Ohioans will vote by mail than ever before. I think 2020 will be the highest turnout presidential

election we've ever seen in our state's history. I think it will be the highest rate of absentee

voting and early voting. A lot of Ohioans are trying it for the first time so, hopefully, it forms a

good habit where they vote absentee for future elections, but we want to make sure they have the

education necessary and information necessary to not make mistakes and wait until the last

minute."

37.     In the 2020 primary election, of the 1,834,465 Ohioans who voted, 1,831,640 did

so by mail, i.e., 99.9% of the participating electorate. In the 2016 primary election, only 13.7%

of those who voted, did so by mail.

38.     One of the driving reasons behind why more people will absentee by mail is the

COVID-19 pandemic. The COVID-19 pandemic has had an especially severe impact on the

United States. The first known death in the United States caused by COVID-19 occurred in

February 2020.  Since then, the United States has observed more than 5.7 million official cases

of COVID-19 and more than 175,000 deaths. As of August 25, 2020, Ohio reported 116,496

COVID-19 cases and 3,996 deaths.

39.     The pandemic has disproportionately impacted Black Americans. Even though

African Americans make up only 13.4% of the United States population, they account for nearly

23% of COVID-19 deaths. Fifty-one states are currently reporting race and ethnicity data for

COVID-19 mortalities, and many states reflect even more stark racial disparities than the

national average. The alarming rates at which COVID-19 is affecting Black Americans can be

attributed to decades of discrimination in housing, employment, healthcare, and the locations of

entities that pollute the air and waters. Today, ongoing discrimination in testing and treatment

continues to fuel significant disparities in COVID-19 cases and outcomes.

40.     The virus that causes COVID-19 is highly contagious and spreads through a

variety of ways, including the respiratory droplets that an infected person produces when they

cough, sneeze, or talk; or through contact between individuals. The virus enters the body through the nose, mouth, or eyes, and then attaches to a protein, which then enters the cell and replicates. Each infected cell can release millions of copies of the virus before the cell breaks down and dies. An infected person who coughs and sneezes can leave respiratory droplets on surfaces where it can remain in an infectious state for several hours to days without a human host.

41.     The risks of severe illness, complications, and death due to COVID-19 increase with age. In addition to age, several other underlying health factors increase the risks associated with COVID-19. People who have underlying health conditions (such as heart disease, diabetes, and lung disease) have weakened immune systems, have cancer, and who are pregnant are considered populations at an increased risk for severe illness from COVID-19.

42.     The Centers for Disease Control and Prevention ("CDC") urges Americans to adhere to social-distancing measures (for example, staying home as often as possible, maintaining at least six feet of physical distance from other people when outside the home, and wearing face masks) to minimize person-to-person contact and reduce the spread of COVID-19. The CDC emphasizes that these measures are crucial for reducing an individual's risk of becoming infected with the disease and for preventing the transmission of the disease throughout the population. It is especially critical for elderly individuals and members of other high-risk populations to continue to adhere to these social-distancing measures for the sake of their own health.

43.     Around early August 2020, Defendant LaRose issued guidance to 88 county boards of elections that directs county boards of elections to permit in-person voters to vote at polling places without a face covering. The guidance, in pertinent part, states, "[b]oards of elections must encourage all voters to wear a mask while physically present inside or in line for

18

the board of elections, early vote center, or polling location. However, even with the ODH [Ohio Department of Health] Order currently in effect, voters cannot be required to wear a mask in order to vote in person. All eligible voters must be permitted to vote."

44.     Defendant LaRose has since stated that election officials cannot prevent a voter who refuses to wear a mask from voting in person because the right to vote is a fundamental right protected by the United States Constitution.

45.     But then, on August 18, 2020, Defendant LaRose, stated that masks will be *required* to vote in person in the November 2020 general election, thus, again, creating more confusion among voters and boards of elections on what rules apply in the upcoming election.

46.     Defendant LaRose's conflicting statements have created confusion among voters and Plaintiffs on safety measures for in-person voting and whether masks will be required to vote inside or outside the polling place in the upcoming general election.

47.     Defendant LaRose's actions around mask mandates have dissuaded Plaintiffs, Plaintiffs' members, and many voters from voting in person, and Defendant LaRose has otherwise encouraged mail-in voting in the November 2020 general election, evident through the many public statements in the media, on Twitter, and on the Secretary of State's website, which makes clear that in any election voters can vote through the "convenience of their own homes by requesting an absentee ballot."

48.     Defendant LaRose has urged counties to set aside the funds allocated to them under the CARES Act to "ensure that each board of elections has enough absentee ballots and envelopes to account for a significant number of voters utilizing absentee voting."

49.     While on the one hand encouraging absentee mail-in voting, Defendant LaRose on the other hand has taken away many voters' ability to do so by limiting each county to a single secure ballot box.

**B.      Delays in USPS Deliveries and Secure Ballot Drop Boxes**

50.     Internal policy changes at the USPS have led to delayed mail deliveries. In July, the USPS administration stated that it had reduced the number of mailboxes, processing and sorting machines, and staff.

51.     Recognizing the issues with the USPS, Defendant LaRose acknowledged, "we are finding that the delivery of the mail is taking far longer than what is published by the United States Postal Service as expected delivery times. Instead of first-class mail taking 1–3 days for delivery, we had heard widespread reports of it taking as long as 7–9 days." Defendant LaRose informed state lawmakers that such "delays mean it is very possible that many Ohioans who have requested a ballot may not receive it in time."

52.     In the primary election, Plaintiffs LWVO and Ohio APRI received calls from voters and members of the public across the State of Ohio that they had not received absentee ballots in time to postmark them by the statutory deadline or never received absentee ballots at all.

53.     LWVO members in Butler County received reports from the local county election board that the USPS delivered more than 300 absentee ballots after the deadline to receive mailed ballots, despite voters having mailed and postmarked them by the statutory deadline.

54.     In early August 2020, the USPS's general counsel sent Defendant LaRose a letter placing him on notice, "[i]n particular, we wanted to note that, under our reading of Ohio's

election laws certain deadlines for requesting and casting mail-in ballots are incongruous with the Postal Service's delivery standards."

55.     The letter informed Defendant LaRose that the USPS uses two main classes of mail to deliver ballots, First-Class and USPS Marketing Mail with delivery times ranging from 2–5 days for First-Class Mail and 3–10 days for USPS Marketing Mail.

56.     Despite his awareness that the State's absentee-ballot deadlines are "incongruous" and "incompatible" with current USPS delivery times, on August 12, 2020, Defendant LaRose issued Directive 2020-16, banning boards of elections from installing any secure drop boxes in the county except for a single one at their boards of elections offices for the November 3, 2020 general election. The Directive requires that beginning September 1, 2020 counties allow voters to drop off completed applications and ballots on a 24/7 basis; mandates that boards continuously monitor their secure drop box; and requires one Republican and one Democrat to jointly empty the secure drop box at least once every day.

57.     A ballot secure drop box provides voters an alternate method to return their absentee applications and absentee ballots, apart from returning applications and ballots by having to interact person-to-person at boards of elections or having to rely on the USPS. Secure drop boxes can take the form of secure slots installed at municipal locations or on governmental property, such as public libraries, other governmental buildings, or stand-alone receptacles on county property. Voters drop off their absentee applications and ballots in sealed and signed envelopes in a designated secure drop box.

58.     Since the pandemic, the federal government's Cybersecurity and Infrastructure Security Agency Elections Infrastructure Government Coordinating Council and Sector Coordinating Council's Joint COVID Working Group issued guidance to state, local, tribal, and

territorial election officials on how to administer and secure election infrastructure given the COVID-19 epidemic. The guidance recommends that secure ballot drop boxes are a secure way to return absentee ballots. It sets minimum security requirements, recommending that drop-off boxes be located in highly visible, well-lit areas either at indoor and outdoor temporary sites or permanent 24-hour video surveilled sites. The guidance recommends that election boards create chain-of-custody logs to keep track of times that ballots are collected. It also suggests a population/secure drop box ratio of one secure drop box per 15,000 to 20,000 registered voters.

59.    At least two states—Wisconsin and Georgia—that previously did not permit voters to use secure ballot drop- boxes issued emergency guidance weeks before their 2020 primary elections to permit counties to install multiple secure ballot drop boxes accessible to all voters during the pandemic. Maryland, Virginia, and the District of Columbia are also in the process of creating a network of secure drop boxes.

60.    After the primary election in Ohio, boards of elections and voter advocates began expressing the need for boards to install more than one secure box per county for the general election, so that more voters can drop off their absentee applications and ballots without having to rely on the USPS and to reduce in-person lines for early and election-day voting.

61.    Even before 2020, several counties, including Hamilton, Cuyahoga, and Butler, have operated some form of a secure drop box to allow voters to drop off their absentee ballots.

62.    In late July 2020, the mayor of Cleveland and the Cuyahoga County director of elections sent a joint open letter to Defendant LaRose, advocating for additional offsite secure drop boxes at public libraries and recreation centers across the City of Cleveland, as a way to eliminate traffic jams and reduce long lines on election day.

63.     A Hamilton County commissioner and state representative stated that voters without cars would have difficulty accessing one secure drop box and advocated for more secure drop boxes in the county.

64.     In early August 2020, after counties and voter advocates expressed their desire for multiple secure drop box locations, Defendant LaRose requested that Ohio Attorney General Dave Yost provide an opinion on the legality of more secure drop box locations. But before Attorney General Yost could respond, Defendant LaRose rescinded his request and unilaterally issued the Directive banning multiple secure drop box installations in counties, claiming it was too late to make any changes before election day in November. Defendant LaRose has provided no other rationale for banning multiple secure drop boxes..

65.     County board of elections officials across Ohio and elections administration experts have publicly disagreed with Defendant LaRose that it is too late to add secure drop boxes.

### C.     Ohio Law Regarding Return of Absentee Ballots

66.     In Ohio, any qualified voter can request an absentee ballot by mail. Ohio Rev. Code § 3509.02(B). For the November 3, 2020 general election, October 6, 2020 marks the first day that county boards of election must begin mailing out absentee ballots to domestic civilian voters who have requested an absentee ballot.

67.      An Ohio voter who chooses to vote a mail-in absentee ballot must submit a new application for an absentee ballot before every election. Ohio Rev. Code § 3509.03(A). The voter can print an application form from the Secretary of State's website or request that boards of elections mail an application form to the voter's address. But under Ohio law, a voter must

"make written application" to the director of elections "of the county in which the elector's voting residence is located." *Id.*

68.     Once the voter procures and completes an application, the voter must deliver it, by mail or in person, to the county director of elections no earlier than 90 days before the election in question or the first day of January of the year of the election, whichever is earlier no later than (a) noon on the third day before the election if returned by mail or (b) 6 p.m. on the last Friday before the election if delivered in person.  *Id.* §   3509.03(A).

69.     Once the voter receives an absentee ballot, the voter can return the voted ballot in person to the director of elections at the office of the board of elections by the close of polls on election day. *Id.* § 3509.05(A). Or, the voter can designate a close family member to deliver the voter's absentee ballot to the director of elections. *Id.*

70.     In the alternative, the voter can return the voted ballot by mail as long as the ballot envelope bears a postmark no later than the day before election day and the ballot arrives at board of elections office by the tenth day after election day. *Id.* § 3509.05(B).

71.     Election officials can reject absentee ballots for missing information, birthdate discrepancies, or signature discrepancies. *Id.* § 3509.06(D)(3)(b). Ballot rejections can increase the time it takes for a voter to complete the multi-step absentee voting process by adding more steps to the process.

**D.     Burdens on Individual and Organizational Plaintiffs**

72.     A confluence of events substantially burdens Plaintiffs' and Plaintiffs' members right to vote in the upcoming election. These events include the pandemic and its attendant deadly health risks, Defendant's encouragement to Ohioans to vote absentee by mail, the USPS's systemic changes and extensive delays in processing mail, and Defendant's Directive limiting

24

each county to a single secure drop box for delivery of absentee applications and absentee ballots.

73.     Individual Plaintiffs are eligible, registered voters who plan to vote absentee within the timelines required by Ohio statutes. Organizational Plaintiffs are membership organizations engaged in voting rights advocacy in Ohio and assist their members and the general public to access the franchise, including helping them to navigate the multi-step absentee process. The Organizations include members who plan to absentee in the upcoming general.

74.     Ohio APRI, LWVO, and Ohio NAACP have members who are over 60 years of age and/or are immune-compromised, and are at a higher risk of contracting COVID-19. These members effectively cannot vote early in person or in person on election day. Absentee is their only option that protects their health.

75.     Drs. Rikleen and Germany cannot vote in person because they fear exposing others to COVID-19 and fear contracting COVID-19, in particular, if voters appear at polling places without face masks. Drs. Roberts, Rikleen, and Germany will be voting by mail in the November 2020 general election. Ms. Griffin and Judge Connally are older Americans who do not want to vote in person because they at high risk of contracting COVID-19.

76.     Under the circumstances described above, Plaintiffs and Plaintiffs' members believe that their applications and ballots may not be timely delivered because of postal service delays.  For example, many LWVO members did not receive their ballots in time to postmark them on time or did not receive their ballots at all during the primary election; thus, LWVO members fear that if they rely on the postal service in November, or even in late October, their ballots may not be timely delivered.

25

77. Plaintiffs and Plaintiffs' members would like to drop off their voted absentee ballots and applications at secure drop boxes near their homes, so that they can rely, as little as possible, on the postal service and do not have to travel far to their respective county boards of elections to drop off their absentee ballots.

78. Many Plaintiffs live or have members who live in cities and counties that publicly expressed to Defendant LaRose that they would have installed multiple secure drop boxes on governmental property located in different communities. But for Defendant LaRose's Directive, Plaintiffs and their members would have been able to access secure drop boxes at locations such as public libraries near them.

79. Organizational and Individual Plaintiffs do not trust USPS to timely deliver their election-related mailings. They believe that their absentee ballots will not be counted in the November 2020 general election if they have to rely on USPS.

80. Ohio APRI and Ohio NAACP serve predominantly Black American communities in urban counties in Ohio—including Franklin, Cuyahoga, and Hamilton Counties. In the past, many members of these organizations live and vote in predominantly Black neighborhoods where voters in past elections have experienced long lines that wrap around the block and machine malfunctions at their polling places.

81. Many members do not own cars and have to rely on public transportation to get to their boards of elections offices. During the pandemic, these members do not want to use public transportation to travel to their boards of elections to drop off their applications and ballots.

82. The Directive significantly burdens voters in urban counties with the largest minority populations and percentages. Cuyahoga County has more than 850,000 registered voters. Thirty percent of the population of Cuyahoga County is Black. Defendant's Directive

provides for one secure drop box for approximately 850,000 individuals in Cuyahoga County. It also provides for one secure drop box for the approximately 8,300 mostly White voters in Vinton County, which has a population that is less than 1% Black.

83.    Many Ohio APRI and LWVO members also reside in less urban parts of the State, including the fifth most populous county, which is Montgomery County and smaller, more rural regions like Warren, Summit, and Lucas Counties.  Many members must drive more than 30 minutes, in some cases an hour, to get to their local boards of elections. If permitted, these members would drop off their ballots at secure drop box locations closer to their homes. Having to drive long distances to get to their boards of elections to drop off their absentee ballots significantly burdens many LWVO and Ohio APRI members.

84.    For Plaintiffs and Plaintiffs' members, dropping off their absentee applications and absentee ballots at secure drop box locations is the only viable option for ensuring that their boards of elections timely receive their applications and ballots. Without sufficient drop-off box locations across their counties, Plaintiffs will be disenfranchised. In the alternative, Plaintiffs would drop off their absentee ballots at polling places closest to their homes if permitted to do so.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Directive 2020-16 Violates the Fundamental Right to Vote Under
the First and Fourteenth Amendments of the United States Constitution**

85.    Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

86.     The right to vote is a "precious" and "fundamental" political right that is "preservative of all rights." *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966); *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). "Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). The Constitution therefore protects both the fact of the franchise itself, and "the manner of its exercise." *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 477 (6th Cir. 2008).

87.     To determine whether a state election law or procedure unconstitutionally burdens the fundamental right to vote, courts apply the *Anderson-Burdick* framework. *See Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick v. Takushi*, 504 U.S. 428 (1992). Under the Anderson-Burdick test, Courts considering a challenge to a state election law or process must carefully balance the magnitude of injury to the First and Fourteenth Amendments rights that Plaintiffs seek to protect against the government's justifications for the burdens established. *Mich. State A. Philip Randolph Inst. v. Johnson*, 833 F.3d 656, 663 (6th Cir. 2016).

88.     Directive 2020-16 substantially burdens Plaintiffs' constitutional right to vote, as it forces them to choose between risking their health by voting in-person so that they have more assurance that their ballots will count or, instead, facing the real possibility that their ballots will not count because of USPS delays in timely delivering absentee ballots and applications combined with the practical inability to use the single secure drop box in their county to deliver their absentee ballot applications and ballots. It burdens Plaintiffs and their members who have to drive long distances to get to their boards of elections. It further burdens Plaintiffs and their members who do not have access to cars and either have no access to mass transportation, or do not wish to use mass transportation if they can avoid it during the pandemic.

89.    Defendant has no legitimate interest in preventing counties from installing more than one secure drop box location to make voting by mail more accessible to all voters.

### SECOND CAUSE OF ACTION

**Directive 2020-16 Violates the Equal Protection Clause
of the Fourteenth Amendment**

90.    Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

91.    The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prohibits states from "deny[ing] to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend.  XIV, § 1. The Fourteenth Amendment's Equal Protection Clause forbids the State from, "[h]aving once granted the right to vote on equal terms . . . by later arbitrary and disparate treatment, valu[ing] one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104–05 (2000). Only "specific standards" and "uniform rules" provide "sufficient guarantees of equal treatment."  *Id.* at 106–07. The Sixth Circuit stated that a state cannot "arbitrarily" deny or dilute "the right to vote depending on where [voters] live." *League of Women Voters v. Brunner*, 548 F.3d 463, 476 (6th Cir. 2008).

92.    Directive 2020-16 arbitrarily values one person's vote as compared to another's based on population size and population density of a particular county. For example, Vinton County has 8,307 registered voters will be advantaged while counties with larger populations such as Cuyahoga County with more than 845,000 registered voters will be disadvantaged because of the Directive. Thus, while the Directive substantially burdens all Ohioans, that burden is greater for who live in more populated counties because only one secure drop box is available per hundreds of thousands of registered voters in the county.

93. Defendant LaRose's Directive disproportionately burdens Black and other minority voters, such as those who are members of Ohio APRI and Ohio NAACP because those Ohio voters are concentrated in the largest, urban counties with the highest population densities.

94. Because of Directive 2020-16, Defendant LaRose is responsible for administering an election system that arbitrarily burdens voters' fundamental right to vote, in particular, Plaintiffs who live in more populous counties.

95. This disparate treatment of voters violates the Equal Protection Clause of the United States Constitution.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

(1) Declare Directive 2020-16, to the extent that it bans multiple secure drop boxes per county, unconstitutional in violation of the First and Fourteenth Amendments of the United States Constitution;

(2) Issue a preliminary and permanent injunction prohibiting Defendant LaRose from enforcing Directive 2020-16 from now throught he November 3, 2020 general election;

(3) Order Defendant LaRose to rescind Directive 2020-16;

(4) Order Defendant LaRose to immediately permit boards of elections to install multiple secure ballot drop boxes for the November 3, 2020 general election and to take all steps necessary to facilitate that relief;

(5) Order Defendant LaRose to allow voters to return absentee applications and ballots to any polling places in the county in which they reside and are registered to vote;

(6) Award Plaintiffs their costs, including attorneys' fees under 42 U.S.C. § 1988, and any other available statutes; and

(7)     Provide such other and further relief as the Court deems just.

Respectfully submitted,                                    Dated: August 26, 2020

    _s/ James Schuster_____
James Schuster (Ohio Bar No. 0065739)
JSA LLP
2355 Bellfield Ave.
Cleveland Heights, OH  44106
Telephone: (216) 882-9999
jschuster@OHcounsel.com

Jon Greenbaum+
Ezra Rosenberg*
Pooja Chaudhuri*
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
1500 K Street N.W., Suite 900
Washington, D.C. 20005
Telephone: (202) 662-8600
jgreenbaum@lawyerscommittee.org
erosenberg@lawyerscommittee.org
pchaudhuri@lawyerscommittee.org

Subodh Chandra (Ohio Bar No. 0069233)
Donald P. Screen (Ohio Bar No. 0044070)
Brian D. Bardwell (Ohio Bar No. 0098423)
THE CHANDRA LAW FIRM LLC
1265 W. 6th St., Suite 400
Cleveland, OH 44113-1326
Telephone: (216) 578-1700
Subodh.Chandra@ChandraLaw.com
Donald.Screen@ChandraLaw.com
Brian.Bardwell@ChandraLaw.com

Neil A. Steiner*
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10019

PRIVILEGED CONFIDENTIAL - ATTORNEY WORK PRODUCT
Draft as of 8/25/2020

Telephone: (212) 689-3500
neil.steiner@dechert.com

Erik Snapp*
DECHERT LLP
35 West Wacker Drive, Suite 3400
Chicago, IL 60601
Telephone: (312) 646-5800
erik.snapp@dechert.com

Lindsey B. Cohan*
DECHERT LLP
515 Congress Avenue, Suite 1400
Austin, Texas 78701
Telephone: (512) 394-3000
lindsey.cohan@dechert.com

Theodore E. Yale*
DECHERT LLP
Cira Centre, 2929 Arch Street
Philadelphia, PA  19104
Telephone: (215) 994-4000
theodore.yale@dechert.com


+Not Ohio barred but admitted to practice in this Court
*Pro Hac Vice forthcoming


*Attorneys for Plaintiffs*