# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

A. PHILIP RANDOLPH INSTITUTE OF OHIO, et al.,

    Plaintiffs,

v.

FRANK LAROSE, in his official capacity as Secretary of State of Ohio,

    Defendant.

Case No. 1:20-cv-01908

Hon. Dan Aaron Polster

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs respectfully move for a preliminary injunction. Unless this Court acts now, tens of thousands of Ohioans will lose their right to vote in the November election. This is not a hypothetical. Defendant Ohio Secretary of State Frank LaRose has predicted that the COVID-19 pandemic, combined with a hotly contested presidential election, will result in Ohio's experiencing "the highest rate of absentee voting" ever,[1] with about 2.4 million absentee voters.[2] The well-publicized delivery problems experienced by the United States Postal Service ("USPS") have created a substantial risk that millions of absentee ballots will not be delivered in time to be counted. Even *before* the recent controversial changes at the USPS, LaRose expressed concern that voters would be prevented from casting a ballot because mail was taking as long as 7 to 9 days to be delivered.[3] Today, it is expected to take 11 to 17 days for completed absentee ballots to be delivered to boards of elections. Exh. A, Ditchey Decl. at ¶¶ 15-18.

Despite LaRose's recognition of these dire circumstances, he issued Directive 2020-16, which prohibits any Ohio county from installing a ballot drop box for receiving absentee ballots anywhere other than the county board of elections. Exh. B, Ohio Sec'y of State, Directive 2020-16 (Aug. 12, 2020). Counties with hundreds of thousands of voters are limited to a single drop-box location, the same as counties with only a few thousand. No Ohio statute limits drop boxes to a single location at the county board of elections, or authorizes LaRose to do so. Regardless, the issue of statutory authorization for LaRose's action is irrelevant: the issue presented is whether LaRose's Directive—permitted by statute or not—passes constitutional muster. Thus, even if the

---

[1] Kaylyn Hlavaty, *Ohio Sec'y of State LaRose Urges Early Absentee Voting, Nixes Extra Drop Boxes*, News 5 Cleveland (Aug. 12, 2020), https://www.news5cleveland.com/news/election-2020/ohio-secretary-of-state-larose-urges-early-absentee-voting-nixes-extra-drop-boxes.

[2] Ohiosos.gov, LaRose Proposes Innovation Solution Innovative Solution to Pay Postage for Absentee Ballots (Aug. 18, 2020), https://www.ohiosos.gov/media-center/press-releases/2020/2020-08-18-a/.

[3] Memorandum from Frank LaRose to Ohio Congressional Delegation (Apr. 23, 2020) at 1, https://www.ohiosos.gov/globalassets/media-center/news/2020/2020-04-24.pdf

pending state court proceedings as to LaRose's statutory authority confirm his action, this Court must still rule on Plaintiffs' claims. As the court recognized in *Libertarian Party of Ohio v. Brunner*, enjoining a Secretary of State directive, even if the directive is "a valid exercise" of the Secretary's authority, the court nevertheless may find that it "imposes unconstitutional burdens on First Amendment rights and is invalid." 567 F. Supp. 2d 1006, 1013 (S.D. Ohio 2008).

The Directive is unconstitutional. Whether viewed through the prism of the Equal Protection Clause or the *Anderson/Burdick* right-to-vote test, the answer is the same: LaRose's Directive unconstitutionally burdens Plaintiffs' and other Ohioans' ability to cast their ballots. No state interest justifies LaRose's action.

The harm is palpable. It hits hardest Ohio counties with the largest populations, and particularly voters who are poorer and people of color and understandably fearful of voting in-person during a pandemic that has disproportionately devastated these populations. For example, approximately 15% of Cincinnati and Cleveland's voting population, primarily poor people who are disproportionately persons of color, will have to travel more than 90 minutes to and from the drop-box location, a burden that is significant and will either deter many from voting or force them to risk their health by voting in person. Exh. C, Chatman Decl. at ¶¶ 48, 78.

If these voters make it to the drop boxes, they will find even greater obstacles in their way of casting their ballots. Of the approximately 2.4 million Ohioans expected to vote by absentee ballot in the 2020 general election, about a third are expected to deliver their ballots to drop boxes, rather than rely on USPS to deliver their ballots on time, and about half of them are expected to do so on Election Day. Exh. C, Chatman Decl. at ¶¶ 55-57. Indeed, given Ohio's requirement that ballots be postmarked no later than the day before Election Day, voters who wait to submit their absentee ballots until Election Day cannot use USPS to deliver their ballots. *See* Ohio Rev. Code

2

Ann. § 3509.05(B)(1). When these voters arrive at the drop boxes in populous counties like Cuyahoga, Franklin, and Hamilton, they will be confronted with extraordinarily long lines at the single drop box sites, forcing them to choose between waiting many multiple hours to drop off their ballots, risking their health by attempting to vote in person, or, more likely, leaving the line and not voting at all. Exh. D, McCool Decl., Attach. 2 at 18-20. There is also a real danger these voters would then deposit their absentee ballot in a mail box, and, because of the postmark rule, their ballot would not count.

This result will necessarily and unconstitutionally disfavor voters of highly populated counties relative to those of lightly populated counties. While the 7,903 registered voters in Noble County may find a single drop-box location sufficient, the 858,041 in Cuyahoga County will not. Burdens on the exercise of the right to vote must fall equally on Ohio's citizens. *Bush v. Gore*, 531 U.S. 98, 104-05 (2000). If permitted to stand, LaRose's Directive assures that they will not.

Experts estimate that tens of thousands of Ohio voters are likely to be disenfranchised in this way. Exh. C, Chatman Decl. at ¶ 76; Exh. D, McCool Decl., Attach. 2 at 29-30. The balance of the equities thus weighs heavily in favor of granting relief. Plaintiffs understand the concern that granting relief, if ultimately reversed, could place in jeopardy the votes of those who deposit their ballots in additional drop boxes provided by the counties during the period following an injunction and prior to reversal. But that is not a basis to deny relief and allow an unconstitutional limit on drop boxes to remain. Moreover, the well-established *Purcell* doctrine would preclude a reviewing court from disenfranchising voters in that manner, particularly here, where there is no question that the voters who returned ballots to drop boxes were eligible to cast the ballot and the only dispute relates to where the ballot was cast. *See Frank v. Walker*, 574 U.S. 929 (2014).

As LaRose proclaimed a few months ago, Ohioans "mustn't be forced to choose between

their health and exercising their constitutional rights."[4] Yet he now forces that choice on all Ohio voters. This Court should enjoin LaRose from enforcing his Directive that prohibits Ohio's counties from providing voters with a free, fair, equal, and safe opportunity to cast their ballot.

## BACKGROUND

### A. Absentee Voting in Ohio

Under Ohio law, any qualified voter may vote absentee in an election—no excuse is required to receive an absentee ballot. Ohio Rev. Code Ann. § 3509.02(A). To vote absentee, (1) the voter must deliver to the county board of elections an application for an absentee ballot; (2) if the application is approved, the board of elections must then send an absentee ballot to the voter; (3) the voter must return the completed ballot to the board of elections. *Id.* §§ 3509.03-.05. The last day for Ohioans to submit an application for an absentee ballot is October 31, 2020, and completed absentee ballots must be (1) personally delivered to the board of elections by the close of the polls on November 3, 2020, or (2) postmarked by November 2, 2020 and received by the board of elections by November 13, 2020. *See id*. §§ 3509.03, 3509.05.

### B. COVID-19 and Its Impact on Mail-In Voting in Recent Elections

Contactless voting in the time of COVID-19 is essential. To date, 6 million U.S. cases are confirmed, and the death toll stands at more than 185,000.[5] In March 2020, in response to the "scientific evidence" that in-person voting could "dangerously advance[] the spread of coronavirus across Ohio," Governor Mike DeWine and LaRose canceled Ohio's primary election hours before it was set to go forward, stating that it was "abundantly clear that it would have been impossible

---

[4] Ohio Dep't of Health, Joint Statement from Governor DeWine and Secretary LaRose on Ohio Primary (March 16, 2020), https://coronavirus.ohio.gov/wps/portal/gov/covid-19/resources/news-releases-news-you-can-use/joint-statement-governor-dewine-secretary-larose-ohio-primary.

[5] Centers for Disease Control, United States COVID-19 Cases and Deaths by State, https://covid.cdc.gov/covid-data-tracker/#cases.

4

to carry out a fair, accessible, and safe election."[6] The primary election was moved from March 17 to April 28 and voting was ordered to take place exclusively by absentee ballot, with limited exceptions. *See* OH LEGIS 30 (2020), Am. Sub. H.B. 197 ("HB 197"), Section 30(D). 99.8% of voters voted absentee in that election.[7]

Already, elections held during the COVID-19 pandemic have been linked to outbreaks of infection. Exh. E, Lederman Decl. at ¶ 18. Data from the 2016 election in Ohio indicate that approximately 2 of every 5 voters in Ohio belong to groups at high risk for serious illness should they acquire COVID 19. *Id*. Polling places are often crowded and poorly ventilated, presenting risks of contagion even from asymptomatic individuals. *Id*. at ¶ 17. Furthermore, whether Ohio voters must wear a mask while voting in-person remains the subject of confusion. On August 12, 20202, LaRose issued guidance that "voters cannot be required to wear a mask in order to vote in person."[8] Just days later, however, he announced that "masks are required at Ohio voting locations … for both our elections officials and … the voters," but has not issued any formal directive requiring voters to wear masks at polling locations.[9]

### C. Use of Drop Boxes in Ohio

As part of emergency legislation for the 2020 primary, the Ohio General Assembly mandated that each board of elections place a secure drop box outside its office for the return of absentee ballots. HB 197, Section 32(E)(1). This requirement applied solely to the 2020 primary

---

[6] Joint Statement, *supra*, n.4.

[7] *Compare* Absentee Supp. Report, https://www.sos.state.oh.us/elections/election-results-and-data/2020/.

[8] Ohio Sec'y of State Health Guidance for Bd. of Elections (Aug. 12, 2020) at 5, https://www.ohiosos.gov/globalassets/media-center/news/2020/2020-08-12.pdf.

[9] Masks are required to vote in November: Ohio's Secretary of State (Aug. 18, 2020), https://fox8.com/news/masks-are-required-to-vote-in-november-ohios-secretary-of-state-now-says/

election and did not prohibit counties from offering more than one drop-box location. *Id.* State law neither mandates nor prohibits multiple drop boxes in a county. Ohio Rev. Code, Title 35.

For many counties, the Ohio General Assembly's decision to provide for ballot drop boxes was nothing new: they have offered drop boxes for years, and in many cases, at multiple locations throughout the county. *See* Exh. F, Chappell Decl. at ¶ 10 (drop box provided in Cuyahoga County since 2012); Exh. G, Schuster Aff. at Exh. A, ¶ 11 (drop box provided in Hamilton County since 2012, with multiple locations previously offered). Following the 2020 primary, several officials expressed the need to expand ballot drop-box locations for the 2020 general election to increase contactless voting during COVID-19, reduce reliance on the beleaguered USPS, and eliminate traffic jams and long lines "that could suppress voter turnout."[10] Cuyahoga County, for example, considered adding five drop-box locations for the general election. Exh. F, Chappell Decl. at ¶ 27.

On July 20, 2020, LaRose requested an opinion from the Ohio Attorney General on the legality of adding more drop-box locations,[11] but withdrew his request on August 11, 2020, before the Attorney General issued his opinion.[12] The next day, LaRose issued Directive 2020-16, mandating that each county board of elections office maintain a drop box, but expressly "prohibit[ing]" the boards of elections "from installing a drop box at any other location other than the board of elections." Exh. B, Directive 2020-16. The Directive provides no basis for this restriction. As noted above, Ohio Rev. Code 3509.05, which governs the delivery of absentee

---

[10] July 28, 2020 Ltr. from Mayor Jackson to Sec'y LaRose, available at https://patch.com/ohio/cleveland/place-absentee-vote-drop-boxes-throughout-cleveland-mayor; *see also* July 30, 2020 Ltr. from Mayor Cranley to Hamilton Cnty. Bd. of Elec., available at https://www.wlwt.com/article/cranley-calls-on-board-of-elections-to-create-community-wide-drop-boxes-for-absentee-ballots/33475167

[11] Statement from Ohio Attorney General, https://www.scribd.com/document/472669185/From-Ohio-Attorney-General-Dave-Yost.

[12] *Id.*

6

ballots, is silent on the issue of drop boxes, stating only that an absentee voter "shall mail the identification envelope to the director from whom it was received in the return envelope," or "personally deliver it to the director."

Ballot drop boxes provide voters an alternate, secure method to return absentee ballots and absentee-ballot applications that avoids the need to interact person-to-person at boards of elections or rely on the USPS. *See* Exh. H, McGuire Decl. at ¶ 9. Many states, both before and as a result of COVID-19, have offered ballot drop boxes and adhere to the federal advisory recommendation of one drop box per 15,000 to 20,000 registered voters.[13]

Washington and Oregon, for example, both employ a statewide system of satellite drop boxes, with multiple drop boxes located in each county distributed based on population concentrations and other factors. Exh. H, McGuire Decl. at ¶¶ 10, 11, 13, 16. Typically, in Washington statewide elections, about half or more persons casting a mail-in ballot use drop boxes, and the majority of people in Washington's most populous counties use a drop box on Election Day. *Id.* at ¶ 24, 28. There is no reason to suspect Ohio voters will act differently. *Id.* at ¶ 46.

### D. USPS Acknowledges a "Significant Risk" that Ohioans' Ballots Will Not Be Counted

Highly publicized changes in mail delivery policies in recent months include eliminating mail-sorting machines; prohibiting delivery drivers from waiting for mail sorting facilities to complete processing and loading the day's mail so that mail delivery is delayed an extra day; and eliminating staff overtime, even when necessary to complete the day's work. Exh. A, Ditchey Decl. at ¶ 12. David Ditchey, a former USPS employee with almost four decades of service in Ohio and who continues to be actively involved with the National Association of Letter Carriers

---

[13] Nat'l Conf. of State Legislatures, Ballot Drop Box Definitions, Design Features, Location and Number (Aug. 18, 2020), https://www.ncsl.org/research/elections-and-campaigns/vopp-table-9-ballot-drop-box-definitions-design-features-location-and-number.aspx; McGuire Decl. at Exh. 2.

7

("NALC"), estimates that these changes will result in its taking 11 to 17 days for absentee ballots to reach the county election offices this November after mailing. *Id*. at ¶ 18. Thus, a voter who obtains the required postmark on the day before Election Day, nonetheless faces significant risk that their ballot will not be received in time to be counted.

On July 30, 2020, the USPS notified LaRose that the deadlines imposed by Ohio law for the submission of absentee-ballot applications and the ballots themselves "appear to be incompatible with the Postal Services' delivery standards," and that there was "significant risk" that even if ballots are submitted by the deadlines provided under Ohio law, the USPS may nevertheless be unable to return ballots "in time to be counted." *Id*. at Exh. C.

### E. The Effect of the Directive

#### 1. Directive 2020-16 Places a Substantially Heavy Burden on Poorer Voters Living in Ohio's Largest Cities

Dr. Daniel Chatman, an Associate Professor at University of California, Berkeley and an expert in transportation planning, conducted an analysis of the travel time required for eligible Ohio voters to use a county board of elections drop box. Exh. C, Chatman Decl. at ¶ 6. He determined that limiting drop boxes to a single location in each county would especially burden the 8% of eligible Ohio voters who have no access to a car and who are disproportionately poor. *Id*. at ¶¶ 7-8. Of these carless voters, more than 70% would spend over 90 minutes roundtrip to deliver their ballot to their county's drop box, a travel time which is more than double the average amount of daily household travel for an Ohio resident, and which Dr. Chatman concludes is significantly burdensome. *Id*. at ¶¶ 78-79. These burdens fall disproportionately on people in more populated cities: for example, 14.5% of eligible voters in Cincinnati and in Cleveland would have travel times 2.5 times greater than the state average for travel to a drop box. *Id*. at ¶ 48.

8

### 2. Directive 2020-16 Places a Substantially Heavy Burden on Voters Living in Ohio's Largest Counties.

Dr. Chatman also conducted a queuing analysis, to ascertain the impact of the drop-box limitation on wait lines of both cars and pedestrians, on Election Day—the day that a substantial percentage of voters deliver their absentee ballots. *Id*. at ¶ 10; Exh. H, McGuire Decl. at ¶ 25. Dr. Chatman concluded that queues would be virtually non-existent in most counties, but intolerably long in nine counties. Exh. C, Chatman Decl. at ¶ 69. Cuyahoga, Franklin, Hamilton, Summit, and Montgomery Counties would each be expected to have at least between 9,500 and 35,000 voters waiting longer than 15 hours to drop off their ballots. *Id*. at ¶ 12. Some calculations estimate that up to 400,000 voters in those counties could be affected, and could face wait times of more than 80 hours if they got in line prior to the close of polls on Election Day. *Id*. Obviously, most of these voters will not wait in lines that long. Rather, these "costs" of voting will lead many affected voters to forego the drop box, leaving them with the choice of voting in-person and risking their health or not voting at all, political scientist Dr. Daniel McCool discusses in his expert report, and resulting, most likely, in tens of thousands being disenfranchised. *Id*.; Exh. D, McCool Decl., Attach. 2 at 7-9, 15-21, 28-30.

## ARGUMENT

### I. The Court Should Enjoin the Directive

The Court is empowered to preliminarily enjoin the Directive because (1) Plaintiffs are likely to succeed on the merits, (2) Plaintiffs are likely to suffer irreparable harm, (3) the balance of the equities tips in Plaintiffs' favor, and (4) the relief is in the public interest. *Obama for Am. v. Husted*, 697 F.3d 423, 428 (6th Cir. 2012).

### A. The Directive Violates the Equal Protection Clause

Plaintiffs are likely to succeed on the merits of their Equal Protection claim. Under the Fourteenth Amendment's Equal Protection Clause, "[a] citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972); *see also League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 476 (6th Cir. 2008) ("The right to vote includes the right to have one's vote counted on equal terms with others."). While states are imbued with substantial discretion to design and administer their elections, "[h]aving once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104-05 (2000).

The Directive unconstitutionally restricts counties to one drop-box location, with no regard for population, resulting in increased burdens for voters in more populated counties. As the Sixth Circuit has recognized, it violates the Fourteenth Amendment's guarantee of equal protection to burden Ohioans' right to vote unequally "depending on where they live." *Brunner*, 548 F.3d at 477-78. Indeed, the facts of *Brunner* render that case highly instructive here. There, the Sixth Circuit sustained the plaintiffs' Equal Protection claims based on, *inter alia*, allegations that the state failed to allocate voting machines to counties "proportionately to the voting population," resulting in long wait times for voters in more populated counties. *Id.* at 477-78. The court found that, "[i]f true, these allegations could establish that Ohio's voting system deprives its citizens of the right to vote or severely burdens the exercise of that right depending on where they live in violation of the Equal Protection Clause." *Id*. at 478.

As discussed above, the Directive much more severely burdens certain voters in two ways. First, it will result in intolerably long wait times at the drop boxes on Election Day in the largest counties, compared to virtually no wait times in the smaller counties. Exh. C, Chatman Decl. at ¶

10

79. Second, the travel burden is particularly present in large, urban areas. In Cincinnati and Cleveland poor vehicle-less voters would be forced to travel 2.5 times the state average for a roundtrip to a drop box and home. *Id.* at ¶ 78.

LaRose provided no justification for this disparate treatment in his Directive; nor does one exist. Having recognized the need for ballot drop boxes, LaRose is constitutionally obligated to provide for—rather than prohibit—their *equitable* use. *See Bush*, 531 U.S. at 104-05 ("Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another.").

### B. The Directive Unconstitutionally Burdens Ohioans' Right to Vote

Courts evaluate challenges to voting restrictions under the *Anderson-Burdick* framework, under which "[a] court … must weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments … against the precise interests put forward by the State as justifications for the burden imposed by its rule." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (internal quotation marks omitted). As the Supreme Court has held, *any* burden placed on the right to vote, "[h]owever slight, … must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191(2008) (internal quotation marks omitted).

As demonstrated above, the Directive significantly burdens voters in county's whose single drop-box location will be difficult or impossible for voters to access. That burden is further compounded by Ohio voters' unique need for drop boxes in the 2020 general election due to COVID-19 and the USPS's conceded inability to deliver ballots in time to be counted. *See League of Women Voters of Va. v. Bd. of Elections*, 2020 WL 2158249, at *1, 8 (W.D. Va. May 5, 2020) ("In ordinary times, Virginia's witness signature requirement may not be a significant burden on the right to vote," but "these are not ordinary times."); *Garbett v. Herbert*, 2020 WL 2064101, at

11

*12 (D. Utah Apr. 29, 2020) ("On balance, considering the current pandemic and the totality of the State's emergency measures to combat it, Utah's ballot access framework as applied this year imposed a severe burden…."). Plaintiffs need not "show that they were legally prohibited from voting, but only that [they] have few alternate means of access to the ballot." *Obama for Am.*, 697 F.3d at 431 (internal quotation marks omitted). Here, the Directive forces Ohio voters to choose between three unacceptable options: (1) try to deposit their ballots at a drop box that may be too crowded or too inaccessible by public transportation or walking; (2) take their chance and mail their ballot in, despite the significant risk their ballots will not be delivered in time; or (3) vote in-person, risking contracting COVID-19. And for the many absentee voters who choose to vote on Election Day, the second option is not available because of Ohio's requirement that ballots be postmarked by the day before Election Day.

Plaintiffs can offer no "relevant and legitimate state interests" that justify the burden placed on Plaintiffs' right to vote. LaRose will likely offer two justifications for the Directive: security concerns and the practicality of adding more drop boxes two months before the election. As for the first, the mere invocation of security concerns, without more, will not survive judicial scrutiny without "'evidence that such an interest [makes] it necessary to burden voters' rights.'" *Thomas v. Andino*, 2020 WL 2617329, at *20 (D.S.C. May 25, 2020) (quoting *Fish v. Schwab*, 957 F.3d 1105, 1133, (10th Cir. 2020)). There is no evidence that adding drop boxes will jeopardize ballot security, and other states that employ multiple drop-box locations per county have not experienced any degree of voter fraud associated with the drop boxes. Exh. H, McGuire Decl. at ¶¶ 32-36.

Likewise, there is no evidence that adding more drop boxes would be impractical or overwhelm local officials. As discussed, several Ohio counties, including Hamilton and Cuyahoga Counties, support installing more than one drop box and have noted that, but for LaRose's

12

Directive, they would likely install more drop boxes at public libraries to make voting more accessible. *See* Exh. F, Chappell Decl. at ¶ 10; Exh. G, Schuster Aff. at Exh. A, ¶¶ 21-24. In sum, these speculative and unsubstantiated reasons cannot justify the significant burden the Directive places on Plaintiffs' right to vote.

### C. Plaintiffs Will Suffer Irreparable Harm—Disenfranchisement—If the Directive Is Not Enjoined

"When constitutional rights are threatened or impaired, irreparable injury is presumed. A restriction on the fundamental right to vote therefore constitutes irreparable injury." *See Mich. State A. Philip Randolph Inst. v. Johnson*, 833 F.3d 656, 669 (6th Cir. 2016) (internal quotation marks omitted). This is because "the right of suffrage is a fundamental matter in a free and democratic society." *Reynolds v. Sims*, 377 U.S. 533, 561-62 (1964). As demonstrated above, the Directive violates the First and Fourteenth Amendments because it impermissibly burdens the right to vote, and does so in an arbitrary and disproportionate manner based on voters' county of residence. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

All of the individual Plaintiffs intend to use the ballot drop boxes to submit their absentee ballot in the 2020 general election—they do not want to vote in person because of COVID-19, and they do not trust or expect the USPS to timely deliver their ballots. Exh. I, Jesionowski Decl. at ¶¶ 6-9; Exh. J, Collins Decl. at ¶¶ 5-6; Exh. K, Griffin Decl. at ¶¶ 5, 6; Exh. L, Connally Decl. at ¶¶ 5, 6; Exh. M, Nowling Decl. ¶¶ at 6-8; Exh. N, Germany Decl. at ¶¶ 6-7, 9-10; Exh. O, Rikleen Decl. at ¶¶ 6-8, 10-11. Each of them state that their right to vote is burdened by LaRose's decision to limit each county to one drop box. Exh. I, Jesionowski Decl. at ¶¶ 5, 10-12; Exh. J, Collins Decl. at ¶¶ 4; Exh. K, Griffin Decl. at ¶¶ 4; Exh. L, Connally Decl. at ¶¶ 4; Exh. M, Nowling Decl. ¶¶ at 5; Exh. N, Germany Decl. at ¶ 12; Exh. O, Rikleen Decl. at ¶¶ 13.

13

The Directive makes it overly difficult for the Organizational Plaintiffs' members who live across the state to return their absentee mail-in ballots, particularly those who choose to wait until Election Day to vote. Exh. P, Washington Decl. at ¶¶ 18-25; Exh. Q, Miller Decl. at ¶¶ 15-19; Exh. R, Roberts Decl. at ¶¶ 14-22. Many of Plaintiffs' members lack access to transportation and live in populated counties where they anticipate long lines and traffic jams at the single ballot drop box. Exh. P, Washington Decl. at ¶¶ 20-23; Exh. Q, Miller Decl. at ¶¶ 17-19; Exh. R, Roberts Decl. at ¶¶ 16-19. These members stand to be disenfranchised. Organizational Plaintiffs have also diverted limited resources, including staff and volunteer time, to fielding calls from members and chapter presidents about the Directive and how it will impact members. Exh. P, Washington Decl. at ¶¶ 13-17; Exh. Q, Miller Decl. at ¶¶ 10-14; Exh. R, Roberts Decl. at ¶¶ 8-13.[14]

### D. The Balance of Harms Weighs Heavily in Favor of Granting Plaintiffs' Motion for Temporary Injunction

A "state is in no way harmed by the issuance of a preliminary injunction that prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) (internal quotation marks omitted). After all, "upholding constitutional rights surely serves the public interest," of which the State is the custodian. *Id.* This is particularly true when, as here, no burden results from the injunction because it merely maintains the "status quo." *Michigan State A. Philip Randolph Inst. v. Johnson*, 833 F.3d 656, 669 (6th Cir. 2016).

There is no realistic threat that any votes deposited in additional drop boxes would be disqualified if the Court grants Plaintiffs' relief and its ruling is successfully challenged on appeal.

---

[14] These facts provide plaintiffs with standing to assert their claims. Individual plaintiffs have the threat of concrete injury. *Blum v. Yaretsky*, 457 U.S. 991, 1000 (1982). Organizational Plaintiffs have associational standing in the threat to their members, *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*, 477 U.S. 274, 282 (1986) and organizational standing in the injury to their fulfilling their mission. *Fair Hous. Council, Inc. v. Vill. of Olde St. Andrews, Inc.*, 210 F. App'x 469, 477 (6th Cir. 2006).

14

This is not a case dealing with the eligibility of a voter or the timeliness of the vote. The only issue here is where, within their counties, eligible voters may cast their votes. To disqualify votes cast pursuant to a remedy ordered by this Court, the reviewing court would have to disenfranchise votes cast by eligible voters in judicially sanctioned and county authorized locations. No precedent supports such a result. To the contrary, the Supreme Court has held that a district court's injunction shall remain in place for an approaching election, even if overturned by a federal court. *See Frank v. Walker*, 574 U.S. 929 (2014) (vacating Seventh Circuit's stay of district court's order enjoining enforcement of Wisconsin photo-ID law for 2014 general election). And more recently, the Tennessee Supreme Court overturned a lower court's temporary injunction that expanded the eligibility for absentee voting, but held all absentee ballots submitted by individuals under the temporary injunction would still be counted. *Fisher v. Hargett*, 2020 WL 4515279, at *18 (Tenn. Aug. 5, 2020). Accordingly, were this Court to grant Plaintiffs their relief and were that decision ultimately reversed, there would be no basis in law or equity for the disqualification of any votes cast in the interim.

### E. The Public Has a Strong Interest in This Court Granting Plaintiffs' Motion

The public's interest weighs heavily in favor of granting a preliminary injunction because the public interest "favors permitting as many qualified voters to vote as possible." *Obama for Am.*, 697 F.3d at 437. Having established the Directive's unconstitutionality, Plaintiffs have also established that the public interest is served by a preliminary injunction barring its single-drop-box-per-county limitation.

### CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enter a preliminary injunction prohibiting LaRose from enforcing Directive 2020-16 to the extent that it would limit counties to a single ballot drop box per county.

Dated:  September 4, 2020			Respectfully submitted,

*/s/ James Schuster*
James Schuster (Ohio Bar No. 0065739)
JSA LLP
2355 Bellfield Ave.
Cleveland Heights, OH 44106
Telephone: (216) 882-9999
jschuster@OHcounsel.com

Jon Greenbaum
Ezra D. Rosenberg
Pooja Chaudhuri
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
1500 K Street N.W., Suite 900
Washington, D.C. 20005
Telephone: (202) 662-8600
jgreenbaum@lawyerscommittee.org
erosenberg@lawyerscommittee.org
pchaudhuri@lawyerscommittee.org

Subodh Chandra (Ohio Bar No. 0069233)
Donald P. Screen (Ohio Bar No. 0044070)
Brian D. Bardwell (Ohio Bar No. 0098423)
THE CHANDRA LAW FIRM LLC
1265 W. 6th St., Suite 400
Cleveland, OH 44113-1326
Telephone: (216) 578-1700
Subodh.Chandra@ChandraLaw.com
Donald.Screen@ChandraLaw.com
Brian.Bardwell@ChandraLaw.com

Neil A. Steiner (pro hac vice forthcoming)
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, New York 10019
Telephone: (212) 689-3500
neil.steiner@dechert.com

Erik Snapp
DECHERT LLP
35 West Wacker Drive, Suite 3400
Chicago, IL 60601
Telephone: (312) 646-5800

16

erik.snapp@dechert.com

Lindsey B. Cohan
DECHERT LLP
515 Congress Avenue, Suite 1400
Austin, Texas 78701
Telephone: (512) 394-3000
lindsey.cohan@dechert.com

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on September 4, 2020, a true and correct copy of the foregoing was furnished by electronic filing with the Clerk of the Court via CM/ECF, which will send notice of electronic filling to all counsel of record.

/s/ James Schuster