IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| A. PHILIP RANDOLPH INSTITUTE OF OHIO *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> FRANK LAROSE, in his official capacity as Secretary of State of Ohio, <br><br> Defendant. | Civil Action No. 1:20-cv-01908 <br><br> Judge Dan Aaron Polster |

**INTERVENOR-DEFENDANTS' MEMORANDUM IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Prior to 2020, Ohio voters had two options for returning absentee ballots: by mail or in person to the office of the county board of elections. Ohio Rev. Code § 3509.05(A). In accordance with the plain text of § 3509.05(A), Defendant Secretary of State LaRose's Directive 2020-16 now provides voters a third option of returning their ballots to a drop box at the county board's office.

Plaintiffs have failed to identify any voter who faces any burden due to this new accommodation. Nor could they since the Directive *lowers* the usual burdens of voting and *expands* opportunities for Ohioans to vote. That alone dooms Plaintiffs' suit: "Ohio is a national leader when it comes to early voting opportunities," and Plaintiffs cannot leverage "Ohio's willingness to go even further" to accommodate voters into a constitutional violation merely because the State did not provide them yet an even "more convenient method" to vote. *Ohio Democratic Party v. Husted*, 834 F.3d 620, 623, 629 (6th Cir. 2016).

Plaintiffs nonetheless contend that the new drop-box rule is unconstitutional because the Constitution imbues county boards with unfettered discretion to determine whether, and where, to place any additional drop boxes. In particular, Plaintiffs ask the Court to invalidate § 3509.05(A) and Directive 2020-16 "to the extent that they prohibit counties from providing more than one drop box location." Notice Regarding Plaintiffs' Requested Relief at 2 (Doc. 17) ("Notice"). But Plaintiffs do not seek "relief against any counties" and "do not intend to sue individual counties [that] elect not to install more than one drop box." *Id.* Thus, if the Court grants the requested relief, every county board would be required to install one drop box and would have unreviewable discretion to place—or not to place—additional drop boxes wherever they wish. *See id.*

Plaintiffs never explain how the Constitution can mandate this amorphous drop-box regime when county boards were not required to provide any drop boxes prior to 2020. Plaintiffs' requested relief, moreover, would change precisely nothing—and remedy none of the harms Plaintiffs allege—in counties that choose to install only one drop box, which could be *every* county

in Ohio because Plaintiffs seek no relief against any county. And if some counties install one drop box while other counties install multiple drop boxes, the result will be precisely the kind of unequal treatment of voters "depending on where they live," Pls.' Mem. 10, that Plaintiffs claim to oppose.

Fortunately, the Court need not wade through Plaintiffs' incoherent theory of the case because Plaintiffs lack standing to vindicate the non-party boards' discretion based upon "speculati[on]" as to how they might respond to an injunction. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). In all events, Plaintiffs have failed to show a strong likelihood of success because they have not identified even "a single, individual [Ohio] resident who [would] be unable to vote" due to the Secretary's expansion of voting opportunity. *Crawford v. Marion County Election Bd.*, 553 U.S. 181, 187 (2008). And the equities weigh heavily against granting a disfavored facial injunction that could cause "voter confusion," erode public "[c]onfidence in" the election, and "conflict" with an order of a state appellate court on the eve of the imminent general election. *Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006). The Court should deny the Motion.

## BACKGROUND

"[I]t's easy to vote in Ohio." *Ohio Democratic Party*, 834 F.3d at 628. One option is no-excuse absentee voting. The "director" of the board of elections "shall deliver" an absentee ballot to any eligible voter in the county who has properly applied for one. Ohio Rev. Code § 3509.04(B). The director also supplies the voter an "unsealed return envelope upon the face of which shall be printed the official title and post-office address of the director." *Id.*

The voter "shall mail" her completed ballot "to the director from whom it was received in the return envelope." *Id.* The voter also may "personally deliver it," or entrust it to a close relative for delivery, "to the director." *Id.* "The return envelope shall be transmitted to the director in no other manner," except in circumstances not relevant to this case. *Id.*

Ohio law did not require county boards to install drop boxes before 2020. A few counties

nonetheless chose to make them available, but those drop boxes were located at the boards' offices. Chappell Decl. ¶ 10 (Pls.' Ex. F); Faux Dep. 11:17–11:22 (Ex. A). In response to the COVID-19 pandemic, the General Assembly enacted H.B. 197, which required county boards to "place a secure receptacle outside the office of the board for the return of ballots." Am.Sub.H.B. No. 197, Section 32(E)(1). Directive 2020-07, which the Secretary issued to implement H.B. 197, imposed security requirements for drop boxes, including that they "be monitored 24/7," that "at least one Republican and Democrat . . . together retrieve the drop box's contents daily," and that final retrieval occur at 7:30 p.m. on election night. Directive 2020-07 (Ex. B).

H.B. 197 expired by its terms after the 2020 primary election. On August 12, 2020, the Secretary issued Directive 2020-16, which tracks H.B. 197 and Directive 2020-07. Directive 2020-16 thus requires each county board to install a drop box at its office subject to the same security measures of 24/7 monitoring, daily collection by a bipartisan team, and a 7:30 p.m. cutoff on election night. *See* Directive 2020-16 at 1 (Pls.' Ex. B). Directive 2020-16 also prohibits boards "from installing a drop box at any other location." *Id.*

## ARGUMENT

Four factors are relevant to assessing whether a party has satisfied the heavy burden of establishing an entitlement to a preliminary injunction: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *City of Pontiac Retired Employees Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014).

Plaintiffs' burden is particularly weighty because they seek a "disfavored" facial injunction invalidating the drop-box rule "in all of its applications." *Wash. State Grange v. Wash. Republican Party*, 552 U.S. 442, 449 (2008). Plaintiffs have failed to carry this burden.

I. **PLAINTIFFS LACK STANDING.**

To demonstrate standing, a party must plead (and prove) a "concrete and particularized" injury to a "legally protected interest," caused by the defendant, that the requested relief will redress. *Lujan*, 504 U.S. at 560–61. When "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation . . . of someone else," standing is "substantially more difficult" to establish." *Id.* at 562. In such cases, standing "hinge[s] on the response of the regulated (or regulable) third party to the government action or inaction," and the plaintiff must "adduce facts" showing that the third party will act "in such manner as to produce causation and permit redressability of injury." *Id.* At all times, "[i]t must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 561.

Plaintiffs fail to establish that they have standing. *First*, Plaintiffs have eschewed any legally protected interest in compelling any board "to install more than [the] one drop box" that Directive 2020-16 already requires. Notice 2; *see also* Pls.' Mem. 6 (claiming that "[s]tate law neither mandates nor prohibits multiple drop boxes in a county"). Plaintiffs instead ask the Court to grant county boards discretion to install additional drop boxes. *See* Notice 2. Thus, to the extent that Plaintiffs advance any legal interest, they advance the *boards'* interest in the *boards*' authority to install drop boxes. Any such interest is not "legally protected" on behalf of *Plaintiffs*, so they lack standing to pursue it. *Lujan*, 504 U.S. at 560.

*Second*, Plaintiffs' Motion rests upon "speculat[ion]" regarding what the non-party county boards—the entities "regulated" by § 3509.05(A) and Directive 2020-16—may do if the Court grants an injunction. *Id.* at 561–62; *see also Jaimes v. Toledo Metro. Hous. Auth.*, 758 F.2d 1086, 1096 (6th Cir. 1985). The best Plaintiffs can muster are assertions that "officials" from Cuyahoga and Hamilton Counties "expressed the need to expand drop-box locations for the 2020 general election" and that Cuyahoga County "considered adding five drop-box locations for the general

- 4 -

election." Pls.' Mem. 6. But none of this evidence shows that any board is "likely" to install additional drop boxes if an injunction issues, *Lujan*, 504 U.S. at 560, as "considering" the feasibility of additional drop boxes, Pls.' Mem. 6, is a long way from a vote of the county board approving drop boxes and the attendant logistics, cost, and investment of staff time to secure them, *see* Chappell Decl. ¶ 27 (Pls.' Ex. F); Faux Dep. 20:4–27:3 (Ex. A). Moreover, Plaintiffs point to only two counties, *see* Pls.' Mem. 6, and provide no evidence of what any of Ohio's other 86 counties are "likely" to do if the Court issues the statewide facial injunction that Plaintiffs request, *Lujan*, 504 U.S. at 560. Plaintiffs' contention that county boards will install additional drop boxes is "speculative" at best, so they lack standing. *Id.* at 561.

## II.  PLAINTIFFS HAVE FAILED TO SHOW A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS.

Even if the Court determines that Plaintiffs have standing, it still should deny the Motion because Plaintiffs have failed to establish a strong likelihood of success on either of their claims.

### A.  Ohio Law Permits Drop Boxes Only At The Office Of The County Board.

The statutory reference to "the director" in § 3509.04(A) and § 3509.05(A) means the office of the county board of elections. A voter who mails her absentee ballot "to the director from whom it was received in the return envelope," Ohio Rev. Code § 3509.05(A), mails it to the preprinted "post-office address *of the director*," which is the board's office, *id.* § 3509.04(A) (emphasis added). Accordingly, when § 3509.05(A) refers to personal delivery by the voter or a close relative "to the director," *id.* § 3509.05(A), it likewise means the "post-office address of the director" at the board's office, *id.* § 3509.04(A); *see Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101 (2003) ("[The] normal rule of statutory construction [is] that identical words used in different parts of the same act are intended to have the same meaning"); *Kimble Clay & Limestone v. McAvoy*, 59 Ohio St.2d 94, 97, 391 N.E.2d 1030 (1979) (same).

- 5 -

Section 3509.05(A)'s use of "deliver" underscores this reading. Courts must interpret the General Assembly's words according to "common usage." *Id.* § 1.42; *see also Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175–76 (2009). The dictionary definition of "deliver" means "to give information or documents to someone,"[1] or to take an item "*to people's houses or places of work*."[2]

This reading of the statutory text comports with practical reality. Neither § 3509.04(A) nor § 3509.05(A) requires the director to process applications and ballots herself. Thus, the reference to "the director" does not mean the director personally—and the only other option is the director's office to which voters mail absentee ballots. Ohio Rev. Code §§ 3509.04(A), 3509.05(A).

Plaintiffs are correct that § 3509.05(A) does not use the term "drop box," but that does not mean that it "is silent on the issue." Pls.' Mem. 7. If anything, the statute's non-use of the term "drop boxes" should more naturally be read as a prohibition on their use, not a grant of unfettered discretion to county boards. *See State ex rel. Harbarger v. Cuyahoga Cty. Bd. of Elecs.*, 75 Ohio St.3d 44, 46, 661 N.E.2d 699 (1996). After all, it took a special enactment, H.B. 197, to clarify that county boards were required to install a drop box for the 2020 primary election. In all events, the statute's failure to mention "drop boxes" cannot *exempt* them from its directive that ballots be delivered "to the director" at her official "address." Ohio Rev. Code §§ 3509.04(A), 3509.05(A).

Directive 2020-16 faithfully implements the statutory mandate because it requires absentee ballots to be delivered to the director's office and "in no other manner." *Id.* § 3509.05(A). And even if the Court believes that these statutes are "subject to two different, but equally reasonable, interpretations," it should defer to the Secretary's interpretation in Directive 2020-16. *State ex rel. Herman v. Klopfleisch*, 72 Ohio St.3d 581, 586, 651 N.E.2d 995 (1995); *see also* Ohio Rev. Code

---

[1] *Deliver*, Macmillan Dictionary, definition 1a, https://www.macmillandictionary.com/us/dictionary/american/deliver (accessed Sept. 13, 2020).
[2] *Deliver*, Cambridge Dictionary, first definition, https://dictionary.cambridge.org/us/dictionary/english/deliver (accessed Sept. 13, 2020) (emphasis added)

§§ 3501.05(B), (C), (M) (delineating Secretary's authority to issue directives).[3]

### B. Plaintiffs Have Failed To Show A Strong Likelihood Of Success On Their Unconstitutional Burden Claim.

"As a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown*, 415 U.S. 724, 730 (1974). Accordingly, the Supreme Court has crafted a "flexible standard" to adjudicating unconstitutional burden challenges:

> A court . . . must weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate against the precise interest put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights.

*Burdick v. Takushi*, 504 U.S. 428, 433 (1992). Courts must conduct this analysis in light of "all available opportunities to vote." *Mays v. LaRose*, 951 F.3d 775, 785 (6th Cir. 2020).

#### 1. Plaintiffs' Claim Contravenes The Governing Law.

The Supreme Court's seminal decision in *Crawford* demonstrates that Plaintiffs' Motion should be denied. The *Crawford* plaintiffs brought a facial challenge to an Indiana photo ID law for in-person voters, so "they b[ore] a heavy burden of persuasion." 553 U.S. at 200. But the plaintiffs did not introduce "evidence of a single, individual Indiana resident who [would] be unable to vote" under the law. *Id.* at 187. This evidentiary gap made it impossible to quantify "the magnitude of the burden" or to conclude "how common the problem is." *Id.* at 200, 202.

The Supreme Court recognized that the law placed some burden on voters because it required them to bear "the inconvenience of making a trip to the [Bureau of Motor Vehicles], gathering the required documents, and posing for a photograph." *Id.* at 198. But such

---

[3] In an opinion issued yesterday, the state court held that § 3509.05(A) is ambiguous and declared Directive 2020-16's prohibition on installing drop boxes at a location other than a county board's office "arbitrary." Op. at 29, *Ohio Democratic Party v. LaRose*, No. 20CV-5634 (Franklin Cnty. Court of Common Pleas Sept. 15, 2020). The state court did not enter an injunction, *see id.*, and any appealable order remains subject to appellate review.

inconvenience "surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting." *Id*. Moreover, the State's interests in adopting the photo ID requirement—"deterring and detecting voter fraud," "moderniz[ing] election procedures," and "safeguarding voter confidence"—were "legitimate." *Id*. at 191. The plaintiffs' unconstitutional burden claim therefore failed. *See id*. at 200–04.

Here as well, Plaintiffs have failed to show that the drop-box accommodation burdens the right to vote. Plaintiffs fail to identify "a single, individual [Ohio] resident who [would] be unable to vote" due to this accommodation. *Id.* at 187. Nor could they: the accommodation *lowers* the "usual burdens of voting" for Ohioans. *Id.* at 198. And limiting drop boxes to board offices advances at least three "legitimate" State interests. *Crawford*, 553 U.S. at 191.

*First*, the drop-box rule advances the State's vital interest in "deterring and detecting voter fraud," *Crawford*, 553 U.S. at 191, which is particularly acute in the context of absentee voting. Numerous courts and commentators have recognized the legitimacy of states' concerns about voter fraud—and especially in the context of absentee voting. *See, e.g.*, *id.* at 195–96; *Griffin v. Roupas*, 385 F.3d 1128, 1130–31 (7th Cir. 2004); *Qualkinbush v. Skubisz*, 826 N.E.2d 1181, 1197 (Ill. App. Ct. 2004); *see also* Michael T. Morley, Election Emergency Redlines (March 31, 2020) 2 (Ex. C).

The renowned Commission on Federal Election Reform, which was chaired by former President Jimmy Carter and former Secretary of State James A. Baker III and whose report was cited in *Crawford*, determined that "[a]bsentee ballots remain the largest source of potential voter fraud." Building Confidence In U.S. Elections: Report of the Commission on Federal Election Reform 46 (Sept. 2005) ("Commission Report") (Ex. D). "Absentee balloting is vulnerable to abuse in several ways," including because ballots can be "intercepted" on their way to or from the voter. *Id.* The Commission recommended that states "reduce the risks of fraud and abuse in absentee voting by prohibiting 'third-party' organizations, candidates, and political party activists

from handling absentee ballots." *See id.* Ohio has banned such ballot harvesting. *See* Ohio Rev. Code § 3509.05(A).

History shows these fears are justified and are not hypothetical in Ohio.[4] Elsewhere, absentee voting fraud has affected the outcome of elections and required courts to order new elections. *See* Order ¶¶ 63–64, *In re Investigation of Election Irregularities Affecting Counties Within the 9th Cong. Dist.* (N.C. State Bd. of Elections Mar. 13, 2019) (congressional election); *Pabey v. Pastrick*, 816 N.E.2d 1138, 1145 (Ind. 2004) (primary election); *Matter of Protest Election Returns & Absentee Ballots in Nov. 4, 1997 Election for City of Miami, Fla.*, 707 So. 2d 1170, 1171 (Fla. Dist. Ct. App. 1998) (mayoral election); *Marks v. Stinson*, 19 F.3d 873, 877 (3d Cir. 1994) (state senate election).

Drop boxes exacerbate the risk of fraud and illegal ballot harvesting. For example, on the 2020 primary election day, Cuyahoga County Board staff "witnessed an individual deposit a large volume of ballots into the" drop box. *Minutes of Board Meeting on May 11, 2020,* Cuyahoga County Board of Elections, at 3 (Ex. E). Staff confronted the woman, who admitted that she submitted more than 100 ballots and that another person similarly harvested ballots. *Id.*

The drop-box rule thus advances the State's legitimate interest in combatting voter fraud. It guarantees that drop boxes are securely located and monitored at the board's office, that ballots are retrieved by a bipartisan team, and that ballots remain in election officials' custody from the moment they leave the voter's control. Indeed, had the Cuyahoga County drop box not been securely located and monitored at the board's office, the illegal ballot harvesting that occurred in the 2020 primary election likely would have gone undetected.

---

[4] *See Ohioan gets 5-year prison term for illegal voting*, Cincinnati Enquirer, https://www.usatoday.com/story/news/nation/2013/07/17/cincinnati-illegal-voting/2530119/ (Jul. 17, 2013); *Woman admits '09 vote fraudulent*, Columbus Dispatch, https://www.dispatch.com/content/stories/local/2011/09/10/woman-admits-09-vote-fraudulent.html (Sept. 10, 2011).

*Second*, the drop-box rule promotes the "orderly administration" of the State's elections. *Crawford*, 553 U.S. at 196. Plaintiffs do not challenge Directive 2020-16's mandate that drop boxes be "secure" through 24/7 monitoring, daily collection by a bipartisan team, and a 7:30 p.m. cutoff on election night. *See* Directive 2020-16 at 1. Multiple drop boxes therefore would compound costs to counties and taxpayers and increase diversion of staffing resources that could be devoted to other tasks, particularly on election night. *See, e.g.*, *id.*; Faux Dep. 36:6–9 (Ex. A).

*Third*, the drop-box rule promotes the State's interest in "protecting public confidence in the integrity and legitimacy of representative government" and encouraging "citizen participation in the democratic process." *Crawford*, 553 U.S. at 197 (internal quotation marks omitted). The drop-box rule advances this important interest by giving Ohio voters confidence that ballots are properly returned to the State and that a chain of custody can be established. This demonstrates that the State takes seriously, and imposes safeguards against, voter fraud.

### 2. Plaintiffs' Counterarguments Fail.

Plaintiffs offer six arguments in an attempt to salvage this claim, all of which fail. *First*, Plaintiffs point to two cases in which courts purportedly changed election laws "due to COVID-19 and the USPS's conceded inability to deliver ballots in time to be counted." Pls.' Mem. 11. But those inapposite cases involved signature requirements that required voters to come into close personal contact with others. *See League of Women Voters of Va. v. Bd. of Elections*, 2020 WL 2158249 (W.D. Va. May 5, 2020); *Garbett v. Herbert*, 2020 WL 2064101 (D. Utah Apr. 29, 2020). By contrast, courts across the country have upheld deadlines for returning ballots by mail or in person during the COVID-19 pandemic, even in states with no drop-box option. *See Disability Rights Pa. v. Boockvar*, No. 83 MM 2020, 2020 WL 2507661 (Pa. May 15, 2020); *Delisle v. Boockvar*, No 95 MM 2020, 2020 WL 3053629 (Pa. May 29, 2020); *see also Stapleton v. Thirteenth Judicial Dist. Ct.*, No. OP 20-0293 (Mont. May 27, 2020) (Ex. F); *Nielsen v. DeSantis*,

- 10 -

No. 4:20-cv-236-RH-MJF (N.D. Fla. June 24, 2020) (Ex. G); *Thomas v. Andino*, No. 3:20-cv-01552-JMC, 2020 WL 2617329 (D.S.C. May 25, 2020).

*Second*, Plaintiffs and their putative expert, Mr. Ditchey, attempt to make much of alleged mail delays purportedly caused by Postmaster General DeJoy's recent policy changes. *See* Pls.' Mem. 7; Ditchey Decl. ¶¶ 11–19 (Pls.' Ex. A). Of course, any such mail delays would not be unique to Ohio, but as mentioned, they have not been sufficient to persuade other courts to jettison other states' delivery requirements for ballots. Moreover, Plaintiffs never inform the Court that Postmaster General DeJoy has halted those policy changes (to the extent they were ever adopted) in order to alleviate any concerns about their effect on the delivery of election mail. *See Statement of Postmaster General Louis DeJoy Before Senate Committee On Homeland Security* at 10–14 (Aug. 21, 2020) (Ex. H). In fact, the U.S. Postal Service is engaging "standby resources" to "satisfy any unforeseen demand" regarding election mail and has promised Congress that it "is ready to take on and handle whatever volume of election mail it receives this fall." *Id.* at 14.

*Third*, Plaintiffs cite declarations from voters who "do not want to vote in person" and "do not trust or expect USPS to timely deliver their ballots." Pls.' Mem. 13. But none of the declarants "expressed a personal inability to vote under" under the challenged rule. *Crawford*, 553 U.S. at 201. At most, Plaintiffs' declarations show that some voters would prefer to deliver their ballot to a drop box. But the Constitution does not "require [the State] to maximize voting convenience." *Ohio Democratic Party*, 834 F.3d at 629. Rather, it prohibits imposition of unconstitutional burdens on voters, which Plaintiffs have failed to establish. *See supra* Part II.A.1.

*Fourth*, Plaintiffs express concern that the Secretary's rule will harm "absentee voters who choose to vote on Election Day." Pls.' Mem. 12. But deadlines are part and parcel of a constitutional election scheme. *See Rosario v. Rockefeller*, 410 U.S. 752, 758 (1973); *Mays*, 951 F.3d at 787. Moreover, any "interest . . . in making a late rather than an early decision" to request

or complete a ballot is slight at best, and is outweighed by the State's interests advanced by the drop-box rule. *Storer*, 415 U.S. at 736; *see also Rep. Nat'l Comm. v. Dem. Nat'l Comm.*, 140 S. Ct. 1205, 1207 (Apr. 6, 2020). Given Ohio's generous absentee voting scheme, any voter's inability to cast a timely ballot is "not caused by" the drop-box rule but instead "by their own failure to take timely steps to" vote. *Rosario*, 410 U.S. at 758; *see also Mays*, 951 F.3d at 786–87.

*Fifth*, Plaintiffs narrow in on the burdens that the drop-box rule allegedly imposes on two subgroups of voters: "[p]oorer voters living in Ohio's largest cities" and "[v]oters living in Ohio's largest counties." Pls.' Mem. 8–9. Whether such a subgroup claim is even cognizable under the *Anderson/Burdick* framework is at best unclear. *See Crawford*, 553 U.S. at 204–09 (Scalia, J., concurring); *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 631 (6th Cir. 2016) ("*NEOCH*"). In all events, a subgroup claim fails when, as now, "the record . . . is devoid of quantifiable evidence from which an arbiter could gauge the frequency with which th[e] narrow class of voters has been or will become disenfranchised" by the challenged law. *NEOCH*, 837 F.3d at 631. In fact, the evidence here resembles—but is weaker than—the voluminous evidence that the Supreme Court held was insufficient to establish an unconstitutional burden on any voter or subgroup of voters in *Crawford*. *See Crawford*, 553 U.S. at 201–02; *Ind. Democratic Party v. Rokita*, 458 F. Supp. 2d 775, 795–802 (S.D. Ind. 2006), *aff'd*, *Crawford*, 553 U.S. 181.

*Finally*, Plaintiffs contend that no "relevant and legitimate state interests" justify the drop-box rule because, in their view, there is insufficient evidence that a proliferation of drop boxes would undermine election "security." Pls.' Mem. 12. Plaintiffs make no effort to reconcile this argument with *Crawford*, in which the Supreme Court upheld a photo ID law for in-person voting on an anti-fraud rationale even though "[t]he record contain[ed] no evidence of any such fraud actually occurring in Indiana at any time in its history." 553 U.S. at 194. After all, "a state certainly need not wait for an election issue to arise before enacting provisions to avoid it." *NEOCH*, 837

F.3d at 635. And a paucity of voter fraud cases reflects that voter fraud is notoriously "difficult to detect and prosecute," *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 396 (5th Cir. 2020), and that anti-fraud measures like the drop-box rule are effective, not unjustified.

> **C.** **Plaintiffs Have Failed To Show A Strong Likelihood Of Success On Their Equal Protection Claim.**

Plaintiffs' equal protection theory proves too much. Plaintiffs posit that the Constitution prohibits the State from "burdening Ohioans' right to vote unequally depending on where they live." Pls.' Mem. 10. Building on this proposition, Plaintiffs contend that Directive 2020-16 is unconstitutional because it limits all counties to a single drop box "with no regard for population" or travel time to and from the drop box. *Id.* But, of course, individual county decisions on a host of election-related matters—such as the location of polling places—can cause unequal voter waiting and travel times across the State. In fact, Plaintiffs' requested remedy would open the door to such unequal treatment: some boards might choose to maintain only one drop box at their offices while others might install many drop boxes all across the county. And Plaintiffs' injunction would create not only *inter*-county disparities, but also *intra*-county disparities, as voters in different neighborhoods might have "unequal" access to drop boxes. *Id.*

Merely to point out these untenable implications of Plaintiffs' equal protection claim is to refute it. But, unsurprisingly, Plaintiffs' claim also contravenes the governing law. That "the practices of boards of elections can vary, and sometimes considerably," does not violate the Equal Protection Clause. *NEOCH*, 837 F.3d at 635. Rather, "the central question in a lack-of-uniform-standards claim" is "whether Ohio lacks 'adequate statewide standards for determining what is a legal vote.'" *Id.* (quoting *Bush v. Gore*, 531 U.S. 98, 110 (2000) (per curiam)). There is no equal protection violation here because § 3509.05(A) and Directive 2020-16 provide "clear prescriptive statewide rules that apply equally to all voters" and counties. *Id.* And § 3509.05(A) and Directive

2020-16 do not extend "preferential" or "arbitrary" treatment to any category of voters or "effectively deprive[]" any voters of "the right to vote." *Id.*; *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 476 (6th Cir. 2008). Plaintiffs' equal protection claim fails.

### III. THE EQUITIES WEIGH HEAVILY AGAINST AN INJUNCTION.

The equities also weigh heavily against issuing a facial preliminary injunction mere days before commencement of absentee voting in the imminent general election. *First*, an injunction barring the State "from conducting this year's elections pursuant to . . . statute[s] enacted by the Legislature"—where no party has shown those statutes to be constitutional—"would seriously and irreparably harm the State" and its voters. *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018). *Second*, "giving effect to the will of the people by enforcing the laws they and their representatives enact serves the public interest," *Thompson v. DeWine*, 959 F.3d 804, 812 (2020), especially here, where an injunction could increase the exposure of the State and its voters to the "real . . . risk of voter fraud," which "could affect the outcome of a close election." *Crawford*, 553 U.S. at 196.

*Third*, the Supreme Court has repeatedly warned that courts should not make last-minute changes to election-administration rules and has described changes "weeks" before an election as too late. *See Purcell*, 549 U.S. at 4–5; *Husted v. Ohio State Conference of N.A.A.C.P.*, 573 U.S. 988 (2014). Such last-minute changes by court order can engender widespread "voter confusion," erode public "[c]onfidence in the integrity of our electoral process," and create an "incentive to remain away from the polls." *Purcell*, 549 U.S. at 4–5.

These risks are "especially" acute here. *Id.* at 4. An injunction from this Court *invalidating* § 3509.05(A) and Directive 2020-16 would "conflict[]" with any order from a state appellate court *upholding* that statute and Directive. *Id.* Plaintiffs, in fact, have *encouraged* the Court to issue a conflicting order if the state courts uphold the drop-box rule, *see* Notice at 2 n.2, but such action at this juncture would violate the *Purcell* principle, *see Purcell*, 549 U.S. at 4–5.

Plaintiffs' balancing of the equities assumes that they have shown a strong likelihood of success in demonstrating a violation of "the fundamental right to vote," Pls.' Mem. 13–15, so it fails because Plaintiffs lack standing and have failed to make such a showing, *see supra* Parts I–II. Plaintiffs also bizarrely assert that their injunction would "maintain[] the 'status quo.'" *Id.* at 14. In fact, Plaintiffs seek a "disfavored" mandatory preliminary injunction to alter the status quo under § 3509.05(A) and Directive 2020-16, but they have failed to show that the Secretary's new accommodation of voters is unconstitutional in *any*, let alone "all," "of its applications." *Wash. State Grange*, 552 U.S. at 450.

Finally, Plaintiffs are simply incorrect to the extent they suggest that an injunction invalidating § 3509.05(A) and Directive 2020-16 could not be stayed or reversed on appeal so close to an election. *See* Pls.' Mem. 14–15. Such an argument has been described as "the legal definition of chutzpah." *Tex. Democratic Party*, 961 F.3d at 412. "[W]hen a lower court intervenes and alters the election rules so close to the election date," appellate courts "should correct that error." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020); *e.g.*, *Merrill v. People First of Ala.*, No. 19A1063 (U.S. July 2, 2020) (staying, nine days before the election, a preliminary injunction entered 29 days before the election).

## CONCLUSION

The Court should deny Plaintiffs' Motion for Preliminary Injunction.

Dated:  September 16, 2020	Respectfully submitted,

s/ *Christopher M. McLaughlin*
Christopher M. McLaughlin  (0078186)
E-mail:  cmmclaughlin@jonesday.com
JONES DAY
North Point, 901 Lakeside Avenue
Cleveland, OH  44114.1190
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

John M. Gore (*pro hac vice*)
E-mail:  jmgore@jonesday.com
Stephen J. Kenny (*pro hac vice*)
E-mail:  skenny@jonesday.com
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700

*Attorneys for Intervenor-Defendants*

## CERTIFICATE OF SERVICE

I certify that on September 16, 2020, a copy of the foregoing Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  Parties may access this filing through the Court's system.

　　　　　　　　　　　　　　　　　　　　*/s/ Christopher M. McLaughlin*
　　　　　　　　　　　　　　　　　　　　*Attorney for Intervenor-Defendants*