IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO (CLEVELAND)

| | |
|---|---|
| A. PHILIP RANDOLPH INSTITUE OF OHIO, et. al. | : |
| | : |
| *Plaintiffs,* | : CASE NO. 1:20-cv-01908 |
| | : |
| v. | : JUDGE POLSTER |
| | : |
| FRANK LAROSE, in his official capacity as Secretary of State of Ohio, | : |
| | : |
| *Defendant.* | : |

**DEFENDANT OHIO SECRETARY OF STATE FRANK LAROSE'S
MEMORANDUM IN OPPOSITION TO PLAINTIFFS'
MOTION FOR PERMANENT INJUNCTION**

Respectfully submitted

DAVE YOST
Ohio Attorney General
*/s/ Charles Miller*
CHARLES MILLER (0073844)
Deputy Chief Counsel
*Counsel of Record*
MICHAEL SLIWINSKI (0076728)
Constitutional Offices Section
30 East Broad Street, 16th Floor
Columbus, Ohio 43215
Tel: (614) 466-2872; Fax: (614) 728-7592
Charles.Miller@ohioattorneygeneral.gov
Michael.Sliwinski@ohioattorneygeneral.gov

*Counsel for Defendant Ohio Secretary of State Frank LaRose*

I. **INTRODUCTION**

One of the biggest threats to public trust in the election system is last minute court orders in expedited election cases that change the voting rules. They create chaos. Decisions can be appealed, and sometimes reversed, resulting in more change, and more confusion. *C.f. Raysor v. DeSantis,* No. 19A1071, 6, 589 U.S. ___ (U.S. Jul. 16, 2020) (Sotomayor, J., dissenting) ("Yet because of the Eleventh Circuit's decision, these voters will have no notice of their potential ineligibility or the resulting criminal prosecution they may face for failing to follow the abrupt change in law.") This is why, under the *Purcell* doctrine, last-minute challenges to impending elections are not condoned, and are instead disfavored. *Republican National Committee v. Democratic National Committee*, No. 19A1016, 2, 589 U.S. ___ (U.S. Apr. 6, 2020) ("This Court has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *citing Purcell v. Gonzalez*, 549 U. S. 1 (2006); *Frank v. Walker*, 574 U. S. 929 (2014); *Veasey v. Perry*, 574 U. S. ___ (2014). State election systems are complex, and hasty changes thrust upon them in the midst of an election cycle can result in many unintended, and sometimes un-envisioned impacts, the brunt of which voters end up bearing.

Courts have increasingly recognized that rather than provide an exception to this general rule, the unprecedented events of 2020 only underscore its importance. The Supreme Court has made clear that executive officials (both state and federal), are to be given a wide birth when dealing with the pandemic. The clarity is crystal in election matters. *Merrill v. People First Ala.,* 591 U.S. ___ (U.S. July 2, 2020) (staying injunction issued because of Alabama's lack of safe and accessible voting processes amid the COVID pandemic); *Tex. Democratic Party v. Abbott*, Nos. 19A1055, 19-1389 591 U.S. ___ (S. Ct. Jun 26, 2020) (staying injunction allowing all Texas voters to vote absentee because of COVID); *People Not Politicians Oregon v. Clarno,* 591 U.S. ___ (U.S.

August 11, 2020)(staying injunction issued because COVID creates unreasonable barriers to circulate petitions). The Supreme Court's message is simple: COVID is disrupting enough. Last minute court orders that change state election laws and procedures set by those elected to navigate those disruptions are impermissible.

Election laws are to be measured against generally applicable constitutional restraints, without special consideration for the unique public health circumstances. *Thompson v. DeWine*, 959 F.3d 804 (6th Cir. 2020) ( "they allege that COVID-19 and the State's stay-at-home orders have made it impossibly difficult for them to meet the State's preexisting requirements …"). If a law is constitutional *sans* COVID, it is constitutional *avec* COVID. *Kishore v. Whitmer,* No. 20-1661, 6, ___ F.3d ___ (6th Cir. Aug. 24, 2020) ("Although their decision was quite understandable, 'we cannot hold private citizens' decisions to stay home for their own safety against the State.' ") *quoting Thompson*, 959 F.3d at 810)

Thus, this case does not present an actual controversy. Ohio provides multitude ways to vote over 28 days. It is not constitutionally required to supply or permit *any* drop boxes for absentee voting, much less multiple drop boxes in multiple locations. If that were the case, Ohio has never had a constitutional election, ever. Finally, this injunction motion is barred by laches. Plaintiffs did not sue when the one-drop-box-per-county rule was adopted in the 2020 Primary (apparently, it was constitutional for the Primary). They instead waited 2 weeks after the Directive to sue, and then waited an additional 10 days before filing their preliminary injunction motion, minutes before midnight on the Friday of a three-day holiday. These repeated and extended delays are inexcusable in expedited election cases.

The rules for the General Election are set. Voters and boards of elections are clear as to what those rules are and how and where absentee ballots are to be returned. voting will commence

in Ohio within two weeks of the hearing in this case. An appeal of any ruling in this case is inevitable now that there is an intervenor. Plaintiffs are not looking to maintain the status quo, they are looking to change it in ways that will undoubtedly be the subject of spin-off litigation, and that could be undone all together. Courts are clear, no one benefits from such uncertainty in the lead up to the election and this Court should reject Plaintiffs' efforts to create it.

## II. BACKGROUND AND FACTS

"[I]t's easy to vote in Ohio[, v]ery easy, actually." *ODP v. Husted,* 834 F.3d 620, 628 (6th Cir. 2016). As the Sixth Circuit recently recognized, "Ohio is generous when it comes to absentee voting." *Mays v. LaRose*, 951 F.3d 775, 779 (6th Cir.2020). All registered voters have the option to vote by absentee ballot without excuse. Ohio Rev. Code § 3509.02. Ohioans have the option to vote absentee either by mail or in-person, and can do so for almost a month prior to the election. Ohio Rev. Code §§ 3509.01(B), 3509.051.

### A. Mail-In Absentee Voting

For the General Election, voters can request absentee ballots until noon on Saturday, October 31, 2020. Ohio Rev. Code § 3509.03(D). Starting on October 6, 2020—a full 28 days before Election Day—voters may return the completed absentee ballot to the board in one of two ways: (1) by mailing it to the board of elections, or (2) by personally delivering it to the director of the board, directly or through certain family or household members. *Id*. To be counted, an absentee ballot must be delivered in person no later than the close of polls on Election Day, or postmarked by the day before Election Day, and received no later than the 10th day after Election Day. Ohio Rev. Code § 3509.05(B).

### B. Early in-person absentee voting.

In addition to the option to vote absentee by mail, Ohio voters can vote early and in person

3

at their county board of elections during designated days and hours. Ohio Rev. Code §§ 3509.01(B)(3), 3501.10(C). The requirement to complete the absentee ballot application is the same for in-person absentee voting as mail-in absentee voting. Ohio Rev. Code §§ 3509.03, 3509.051(A)(2). Each county is permitted to operate only one location for early in-person voting. Ohio Rev. Code § 3501.10(C). Early in-person voting may be done "curbside."

### B. Election Day Voting

All voters have the option of voting at their designated polling place on Election Day. This is true even if the voter requested an absentee ballot. In this event, the voter may cast a provisional ballot that will be counted once it is confirmed that the voter did not already vote the absentee ballot that he or she requested. Voters may also vote curbside, meaning a bipartisan team of election officials will bring a voter to an elector their ballot to them, and cast it in the precinct, once the voter completes the ballot.

### C. The Parties

Plaintiff, the Ohio Chapter of the A. Phillip Randolph Institute ("APRI"), Plaintiff, League of Women Voters ("LWV"), and Plaintiff Ohio State Conference of the NAACP ("NAACP"), (collectively, "Organizational Plaintiffs") all claim to have "advocated for multiple secure drop boxes" since the beginning of the pandemic, but both waited to sue to get them until now. *Id.*, ¶¶ 17, 21, 23. They claim that after the Directive, they had to "quickly shift resources to educating its membership about Directive 2020-016". *Id.* This is the case even though none claim that *before* Directive 2020-016 ("the Directive") any county in Ohio had more than one drop box located anywhere other than the board of elections. Rather, they claim to now be "devoting significant time and resources" educating its members on "the need to request absentee ballots early *given USPS delays*." *Id.* (emphasis added).

4

The named Plaintiffs' claims are basically the same. None want to vote in person because of COVID-19. *Id.,* ¶¶ 26-32. None trust and/or want to use the United States Postal Service to mail in their absentee ballots. *Id.* Although under the Directive the drop box located at the board of elections is available 24 hours per day, 7 days per week for roughly 29 days, See, Directive 2020-016, all are concerned there will be perpetually long lines in which they do not want to wait, or cannot wait, to deliver their ballots. *Id.,* ¶¶ 26, 28-32. Some do not have cars to be able to drive to the board of elections. *Id.,* ¶ 30, others are busy at work and do not have time to drive to the board of elections, *id.,* ¶¶ 27, 32, and others do not want to drive the to the board of elections from their house and would either prefer or be more comfortable having a drop box closer to where they live. *Id.,* ¶¶ 28, 31, 32.

### D. Absentee ballot drop boxes.

The Ohio Revised Code makes no mention of absentee ballot drop boxes. No Ohio law did until the passage of Ohio House Bill 197. H.B. 197, § 32, 133rd GA. Known as the COVID-19 relief bill, H.B. 197 enacted several temporary laws to address the many disruptions caused by the unprecedented global pandemic. This included provisions designed to address closing the polls to in-person voting the day before the 2020 Primary Election. In relevant portion, H.B. 197 extended the deadline by which voters could cast a ballot in the Primary Election and required each board of election to install a secure receptacle at the board of elections in which absentee ballots could be deposited. H.B. 197 § 32(C); (E)(1) ("The board shall place a secure receptacle outside the office of the board for the return of ballots under this section."). Until the General Assembly passed H.B. 197, Ohio law did not expressly require or allow boards of elections to have a secure receptacle, or "drop box" for absentee ballots. Given that H.B. 197 was only temporary, uncodified law to address the election-eve closing of the poling locations, and does not apply to

the General Election, Ohio law still does not authorize or require drop boxes.

Nonetheless, on August 12, 2020 Secretary of State Frank LaRose issued the Directive instructing the boards of elections to continue using the ballot drop boxes that were installed outside of the board offices pursuant to H.B. 197. Voters have access to the drop boxes 24 hours per day, seven days per week, until 7:30 p.m. on Election Day. The Directive further instructs that boards of elections are prohibited from installing a drop box at any location other than the board of elections. *But for* Directive 2020-016 a board of election could have removed the drop box installed in response to H.B. 197, as there is nothing in Ohio law which would have prevented it from doing so. Thus, the upcoming election will be the first General Election where ballot drop boxes are required, and only because of Directive 2020-016.

## II.     LAW AND ARGUMENT

### A. Standard of Review

To be entitled to relief, Plaintiffs must show: (1) they have strong likelihood of success on the merits; (2) they would suffer irreparable injury absent the injunction; (3) issuance of an injunction would not cause substantial harm to others; and (4) the public interest would be served by issuance of an injunction. *See Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000).

### 1. Plaintiff Lacks Standing.

Plaintiffs' initial hurdle is their lack of standing. "Article III of the United States Constitution 'does not extend the judicial power to any legal question, wherever and however presented, but only to those legal questions presented in Cases and Controversies.'" *Fieger v. Mich. Supreme Court*, 553 F.3d 955, 961 (6th Cir. 2009) "Article III's 'case and controversy' requirement is not satisfied, and a court therefore has no jurisdiction, when the claimant lacks standing, that is, 'a sufficiently concrete and redressable interest in the dispute.'" *Id*. Therefore,

"[s]tanding is the 'threshold question in every federal case.'" *Grendell v. Ohio Supreme Court*, 252 F.3d 828, 832 (6th Cir. 2001).

"To establish Article III standing, a party must meet three requirements: (1) 'he must demonstrate injury in fact—a harm that is both concrete and actual or imminent, not conjectural or hypothetical'; (2) 'he must establish causation—a fairly traceable connection between the alleged injury in fact and the alleged conduct of the defendant'; and (3) 'he must demonstrate redressability—a substantial likelihood that the requested relief will remedy the alleged injury in fact.' " *Davis v. Detroit Pub. Schs. Cmty. Dist.*, 899 F.3d 437, 443 (6th Cir. 2018) "The burden of establishing standing is on the party seeking federal court action." *Rosen v. Tenn. Comm'r of Fin. & Admin.*, 288 F.3d 918, 927 (6th Cir. 2002). Additionally, "[A] plaintiff must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000).

### a. Plaintiffs lack a concrete injury.

Individual Plaintiffs' "injury" is that they prefer to vote in a manner that has never existed in Ohio. But, there is no Constitutional right to vote in the manner one prefers. Presumably, many voters would prefer that the board of elections go door-to-door to pick up ballots, as it would be undoubtedly more convenient if it did. But that preference does not rise to the level of a constitutional right. This is especially true here when the named Plaintiffs have so many other available voting options that they are simply rejecting. They do not want to mail their ballots because they subjectively fear the postal service; they don't want to vote at their precinct on Election Day; they don't want to travel to the board of elections to return their ballot because it might be a far drive; and they don't want to use the drop box at the board of elections because if they wait until Election Day to use it (as opposed to the other 28 days it will be available), they

7

think that the line might be long. Plaintiffs' dissatisfaction with Ohio's wide range of voting opportunities, and their inability to choose how and where they vote is not cognizable Constitutional injury.

**b. Plaintiffs' alleged injury is not fairly traceable to the Secretary's Conduct.**

"At a time when the vast majority of Ohio voters are expected to vote absentee by mail this general election *because of* COVID-19 pandemic, and the United States Postal Service ("USPS") is experiencing unprecedented delays," Plaintiffs claim that Directive 2020-016 is unconstitutional. Compl., ¶ 1. Said differently, Plaintiffs are claiming that their constitutional rights are being violated due to factors that are not attributable to Secretary LaRose: COVID-19 and the United States Postal Service. But, the Sixth Circuit just rejected the notion that he can be blamed for COVID-19's impact on elections. *See Thompson v. DeWine,* 959 F.3d 804, 810 (6th Cir. 2020). In *Thompson,* plaintiffs challenged Ohio statutory requirements for gathering signatures on initiative petitions. *Id.* They claimed that due to COVID-19 they were unable to meet the threshold signature requirements to place a measure on the ballot, therefore those requirements were unconstitutional. *Id.* The Sixth Circuit disagreed. Specifically, it held that the COVID-19's impact on the ability to gather signatures for an initiative petition is not "state action" required for a constitutional challenge. It held, "we cannot hold private citizens' decisions to stay home for their own safety against the State." *Id.* The same holds true here. Plaintiffs are emphatic that their alleged injury is fairly traceable to COVID-19 and the USPS, *not* to Secretary LaRose. In fact, the only reason a drop box will be an option for every Ohio voter is *because* of Secretary LaRose and the directive that he issued mandating their availability.

**c. Plaintiffs' alleged injury is not redressed by the relief that they seek.**

8

Plaintiffs seek rescission of the Directive, but doing so will not necessarily result in additional drop boxes anywhere, much less ones that are closer than the board of elections. The named Plaintiffs live in Cuyahoga or Franklin counties, and the Organizational Plaintiffs have members statewide. See generally, Compl. If an injunction is granted, whether and where they are additional drop boxes are installed will be a matter for each county board. *If* a board decides to consider the issue (and there is no guarantee that it will), it will still require approval by a vote of the majority of its members to move forward with installing them. R.C. 3501.11. In some counties, the majority of the members might vote 'no,' and in others the board could end up in a tie vote that the Secretary must break. R.C. 3501.11(X). A board that approves multiple drop boxes might also tie on the issue of how many to install, and where to put them. Ultimately, even with the relief Plaintiffs seek—an injunction *permitting* multiple drop boxes—is several steps from redressing the "injury" they claim – the lack of more, closer drop boxes.

This, of course, says nothing about the spin off litigation that will undoubtedly ensue if multiple drop boxes are permitted can adopt uniform standards for installing them. As the attached chart illustrates, States that have drop boxes also have security and proportionality standards. See, Exhs. 2 & 3. Ohio has none, Plaintiffs don't suggest any, and there is not sufficient time to develop them. Thus the list of potential litigation is long: suits against counties that do not install drop boxes, suits alleging due process violations if some counties have more drop boxes than others, either by raw numbers and/or pro rata, and in the absence of security standards, post-election suits challenging the reliability of the ballots collected. Simply put, the "injury" Plaintiffs claim will not be redressed any time soon by the relief that they seek.

### 2. The Organizational Plaintiffs lack standing.

An organization must establish standing by showing that it has suffered "an injury in fact, fairly traceable to the defendant's conduct, that is likely to be redressed by a favorable decision

9

from the court." *Fair Elections Ohio v. Husted*, 770 F.3d 456, 459 (6th Cir. 2014) citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992). Each element of standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at successive stages of the litigation." *Id*. at 561.

LWV, APRI and NAACP ("Organizational Plaintiffs") lack standing to sue on behalf of their membership. "In addition to establishing standing because of a direct injury to the association, "[a]n association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Tenn. Republican Party (16-3360) v. SEC,* 863 F.3d 507, 520 (6th Cir. 2017) quoting *Sierra Club v. EPA ("Sierra Club 2015"),* 793 F.3d 656, 661 (6th Cir. 2015). "To establish organizational standing, "plaintiff-organizations [must] make specific allegations establishing that at least one identified member had suffered or would suffer harm. Such specificity requires that the plaintiff-organization "name the individuals who were harmed" unless "*all* the members of the organization are affected by the challenged activity." *Id.* quoting *Summers v. Earth Island Inst.,* 555 U.S. 488, 498 (2009). Moreover, the Organizational Plaintiffs were not harmed in their own right. See *Miami Valley Fair Housing Center, Inc. v. Preferred Real Estate Invs., LLC,* No. 2:1-cv-2737, 2017 U.S. Dist. LEXIS 333076, *23-24 (S.D. Ohio March 8, 2017) (denying standing to a fair housing group where there was no evidence that the group *increased* its education and outreach efforts in response to the Defendants' actions).

Organizational Plaintiffs' alleged injury is the expenditure of funds to educate voters that drop boxes will not be appear in locations that never had drop boxes before. Broadcasting to voters

10

that "your voting options have not changed" isn't a cognizable injury because it isn't a message any Organizational Plaintiff needs to make. No voter expects drop boxes to magically materialize where none previously existed. In contrast, Organizational Plaintiffs will potentially expend additional resources to educate members of new drop box locations if the relief they request is granted. If, as Plaintiffs request, every county has the discretion to install a different number of drop boxes at a variety of locations, the Organizational Plaintiffs will necessarily have to divert resources and tailor its message to each of Ohio's 88 counties.

In *Fair Elections,* the Sixth Circuit rejected standing under very similar circumstances. It found that "it is not an injury to instruct election volunteers about absentee voting procedures when the volunteers are being trained in voting procedures already." *Id.* at 459-460. The Sixth Circuit also reasoned that "even if this instruction were an injury, any likely redress by this court would simply substitute a different procedure, which [plaintiff] must teach its volunteers instead." *Id.* at 460. Here, all Plaintiffs can hope for if they get the relief they want is the *possibility* that they may be able to instruct its members that they can deliver their ballots to more than one drop box. *Fair Elections* forecloses their standing here.

    **d. Plaintiffs cannot succeed on the merits of their Constitutional claim.**

Plaintiffs' claim that the Directive unconstitutionally burdens their right to vote will not succeed on the merits. Importantly, do not challenge the constitutionality of any Ohio statute, only the Directive at issue, 2020-016. See, Compl. ¶¶ 85-95, and *Prayer for Relief*. At bottom, their claim is not that the Directive prevents them from voting, but that it prevents them from voting in the manner that they prefer (a place closer to their respective houses). But, it is well-settled that the right to vote does not entail the right to vote at any time and in any manner of a voter's choosing. *Burdick v. Takushi*, 504 U.S. 428, 433 (1992). States have the authority to prescribe

11

"the Times, Places and Manner of holding Elections," U.S. Const. art. I, § 4, and the Supreme Court has characterized this authority as "substantial." *Storer v. Brown*, 415 U.S. 724, 730 (1974). Indeed, states "may without transgressing the Constitution impose extensive restrictions on voting." *Id*. Critically, the Directive does *restrict* voting. To the contrary, it *requires* one more avenue for casting an absentee - a drop box at the board of election -that would not otherwise be guaranteed.

To strike a balance between necessary electoral regulations and the right to vote, courts have developed a tiered system to evaluate election laws. When considering challenges to state election laws under the First and Fourteenth Amendments, the Court must first weigh the "character and magnitude" of the asserted injury to the rights protected by those amendments, *i.e.*, the right to vote. *Burdick*, 504 U.S. at 434 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). The level of scrutiny applied to the challenged law depends on the magnitude of its burden on voting. The Sixth Circuit recently clarified how to conduct this initial step. *See Mays v. LaRose*, 951 F.3d 775 (6th Cir. 2020). Courts should evaluate the voting burden from the perspective of the affected electors, taking into account the whole range of voting opportunities the state provides. *Id*. at 784-85.

Once a court has established a regulation's burden on voting, it must select the appropriate level of scrutiny. Reasonable and non-discriminatory restrictions on voting receive rational-basis review, and the State's "important regulatory interests are generally sufficient to justify the restrictions." *Mays*, 959 F.3d at 808 (quotation marks omitted). On the other hand, a severe burden on voting, "such as exclusion or virtual exclusion from the ballot," receives strict-scrutiny review, and the regulation must advance a compelling State interest. *Id*.

Many election laws fall somewhere in the middle. These laws impose a burden on voting

that falls short of virtual exclusion but affects at least some voters' ability to vote. In these cases, the court must weigh the burden on voting against "the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights." *Mays*, 951 F.3d at 784 (quotation marks omitted).[1] Under this test, the State's interest in "orderly election administration," when supported by evidence, justifies even a "moderate" burden on voting. *Id*. at 791.

The Directive indisputably expands the right to vote, as before it was issued counties were free to remove existing drop boxes and not re-install them before the November General Election. The Directive does not burden anything. Thus, under *Anderson Burdick* the question becomes: how burdensome is a Directive that does not prevent anyone from voting and indisputably expands the right to vote, but does not go as far as Plaintiffs want it to? The answer: not very. Thus, the burden is light, as it implements a reasonable, non-discriminatory standard that is entitled to rational basis review. Applying this standard, Directive 2020-016 is constitutional "'so long as the State's important regulatory interests are generally sufficient to justify the restrictions.'" *Mays,* 951 F.3d at 784, citing *Burdick,* 504 U.S. at 434.

Ohio has an important interest in ensuring that all Ohioans have the same opportunity to securely cast a ballot. The Directive fulfills that interest. Plaintiffs seek to upend that uniformity and security on the even of the November Election. Ohio is not obligated to forego either interest simply because Plaintiffs waited too long to file this suit.

---

[1] Although Sixth Circuit precedents allow the application of *Anderson-Burdick* in equal-protection cases, the Secretary preserves for appeal the argument that those precedents are wrongly decided, as at least one recent decision suggests. *See Mays v. LaRose*, 951 F.3d 775, 783 n.4 (6th Cir. 2020).)

Regardless, Plaintiffs fail to articulate how requiring BOEs to maintain drop boxes for the purpose of absentee voting burdens them. Plaintiffs also gloss over the fact that until the SOS issued the directive, no board of elections in Ohio was required to have a drop box. By requiring all boards of elections to maintain the drop boxes that the temporary law required, the SOS actually lowered the burden required to vote, providing yet another option for voting in Ohio. Moreover, when considered alongside the many ways voters may cast ballots in Ohio over the course of 29 days, the burden is microscopic. "And the claims at issue here challenge the application of only the most typical sort of neutral regulations on ballot access. Even assuming that the state laws at issue implicate the [Constitution], such reasonable, nondiscretionary restrictions are almost certainly justified by the important regulatory interests in combating fraud" *Little v. Idaho*, 589 U.S. \_\_\_, No. 20A18, 3 (U.S. Jul. 30, 2020) (Roberts, C.J., concurring).

e. **The public interest is never served by last-minute change to election procedures.**

It is well-settled that the public interest does not favor the alteration of election processes in the weeks leading up to an election. In *Purcell v. Gonzalez*, 549 U.S. 1 (2006), the Supreme Court vacated an injunction preventing Arizona's voter identification laws from taking effect just before a general election. The Court concluded that "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls." *Id*. at 4-5. Thus, where relief cannot be granted without serious disrupting the State's election process, it must be denied. *See Williams v. Rhodes,* 393 U.S. 23, 24 (1968). *Even where the challenged law is found to be invalid*, when an election is imminent, and the "State's election machinery is already in progress, equitable considerations might justify a court withholding the granting of immediate relief." *Veasey v. Perry,* 769 F.3d 890 (5th Cir. 2014) (quotation omitted).

"Simply put, federal courts have no authority to dictate to the States precisely how they should conduct their elections." *Esshaki v. Whitmer,* 2020 U.S. App. LEXIS 14376, *4 (6th Cir. May 5, 2020). Here, the Plaintiffs urge this Court to do what the *Esshaki* Court swiftly struck down. This Court does not have the authority to upend Ohio election law by requiring a certain number or ratio of ballot drop boxes, or spurring additional litigation over the same.

### f. Plaintiffs' relief will cause Equal Protection problems.

The right to vote is a "precious" and "fundamental" right. *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670, 86 S. Ct. 1079, 16 L. Ed. 2d 169 (1966). "Other rights, even the most basic, are illusory if the right to vote is undermined." [**12] *Wesberry v. Sanders*, 376 U.S. 1, 17, 84 S. Ct. 526, 11 L. Ed. 2d 481 (1964). *Obama for Am. v. Husted*, 697 F.3d 423, 428 (6th Cir. 2012). If the State merely placed "nonsevere, nondiscriminatory restrictions" on all voters, the restrictions would survive if they could be sufficiently justified. See *Crawford*, 553 U.S. at 190. On the other hand, if the State merely classified voters disparately but placed no restrictions on their right to vote, the classification would survive if it had a rational basis. See *McDonald*, 394 U.S. at 807-09 (applying rational basis review where no burden on the right to vote was shown). Here, there is no burden placed on the right to vote. The Directive lowers the burden by requiring drop boxes for the first time. It has a rational basis to locate a drop box at each board of elections, because doing so is most secure, easily serviced, and best facilitates election administration.

### III. CONCLUSION

For the foregoing reasons, and based on the evidence presented at the hearing before this Court Plaintiffs' Motion for Preliminary Injunction must be denied.

Respectfully submitted

DAVE YOST
Ohio Attorney General
/s/ Charles Miller
CHARLES MILLER (0073844)
Deputy Chief Counsel
*Counsel of Record*
MICHAEL SLIWINSKI (0076728)
Constitutional Offices Section
30 East Broad Street, 16th Floor
Columbus, Ohio 43215
Tel: (614) 466-2872; Fax: (614) 728-7592
Charles.Miller@ohioattorneygeneral.gov
Michael.Sliwinski@ohioattorneygeneral.gov

*Counsel for Defendant Ohio Secretary of State Frank LaRose*

**CERTIFICATE OF SERVICE**

I hereby certify that on September _____, 2020, the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the court's system.

/s/ *Michael Sliwinski*
MICHAEL SLIWINSKI (0076728)
Assistant Attorney General

16