## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| A. PHILIP RANDOLPH INSTITUTE, OF OHIO, ET AL., | ) ) ) | CASE NO.  1:20-CV-01908 |
| Plaintiffs, | ) ) | JUDGE DAN AARON POLSTER |
| vs. | ) ) | OPINION AND ORDER |
| FRANK LAROSE, | ) ) | |
| Defendant. | ) | |

Before the Court is Plaintiffs' Motion for Reconsideration of the October 6, 2020 Opinion and Order. **Doc #: 89**. For the following reasons, the Motion is **GRANTED.** The Court re-opens the case, and the Plaintiffs' Motion for Preliminary Injunction, Doc #: 13, is **GRANTED.**

### I.    Introduction

The power of a federal judge to enjoin an order of a duly elected state official should be exercised only when it is essential to vindicate a vital constitutional right, and when all methods short of doing so have been tried. That is the case here.

As the Court has stated previously, the evidence presented at the September 23 hearing identified a very serious looming problem in Cuyahoga County which jeopardized the right to vote for many citizens who were concerned about the reliability of the mail and wanted to personally deliver their ballots. First, there are many people without cars for whom travel to the board to deliver their ballots would be very difficult.  Second, the physical site of the board, with the drop box located in the middle of a small parking lot on E.30th and Chester, cannot accommodate a significant number of cars coming to deliver ballots. The evidence presented showed that the Cuyahoga County board of elections initially was considering remote drop boxes, but that after

1

Secretary LaRose issued Directive 2020-16, the board voted 4-0 on September 14 to deploy staff to receive ballots both at a parking lot controlled by the Cleveland Metropolitan School District, located one block north and across the street from the board office, and at six public libraries throughout the county.

While the Secretary has maintained the problem in Cuyahoga County and the plan the Cuyahoga County board adopted is not a part of this litigation over drop boxes, the Court disagrees. The Cuyahoga County board only voted for its plan to deploy staff to receive ballots off-site because the Secretary had prohibited off-site drop boxes. It has been clear throughout this litigation that the main rationale behind that prohibition was the Secretary's now-rejected interpretation of Ohio law.   He believed Ohio law limited personal delivery to board premises; the Ohio Court of Appeals said there is no such limitation. The Secretary is continuing to restrict boards from implementing off-site collection, and he appears to be doing so in an arbitrary manner.

On October 6, the Court issued a short order dismissing this case without prejudice after concluding that Directive 2020-22, which the Secretary issued October 5, granted permission to all county boards of election to deploy staff to receive absentee ballots at designated off-site locations, subject to procedures ensuring safety and security. As stated in that order, the Court interpreted Directive 2020-22 to permit Cuyahoga County to implement the procedure voted by the board in September to have staff receive absentee ballots at designated libraries throughout Cuyahoga County.

The Court has reviewed the e-mail the Secretary's office sent to the Cuyahoga County board on October 7 explaining that the Court incorrectly interpreted Directive 2020-22. *See* Doc 89-5, Ex. E to Motion for Reconsideration, Email from Bridget Coontz to Mark Musson (Oct. 7, 2020). The Court cannot reconcile the e-mail and the language of Directive 2020-22. The e-mail

states that "the Secretary previously approved the portion of the Cuyahoga County Board's Plan to accept absentee ballot delivery from voters using staffed, bipartisan teams outside the Cuyahoga County Board's office," but that Directive 2020-22 did not authorize board staff to receive ballots at six public libraries, nor did it authorize any other board in Ohio to deploy its staff to receive ballots off-site. *Id.* If "outside the office of the board of elections" means only outside on the board's premises, then it doesn't permit collection one block away and across the street. If "outside the office of the board of elections" means anywhere beyond the board's premises, which is how the Court originally construed it, the Directive permits both the site one block away and across the street and the six public libraries, as well as any other site the Cuyahoga County board chooses, or any off-site location another county board wishes to use in its county. It appears the Secretary has arbitrarily drawn the "outside" boundary somewhere beyond a board's premises but not as far as a library a few miles away. This leaves the Court and the boards with no working definition of where "outside" collection is permissible.[1]

For the reasons set forth below, I am granting the motion for reconsideration, as my October 5 order was based on my incorrect interpretation of the Secretary's latest Directive, and I am re-opening the case and granting Plaintiffs' motion for preliminary injunction. On October 2, the Ohio Court of Appeals held that Ohio law does not require that voters who wish to deliver their completed ballots to the board of elections deliver the ballots to the board office itself, and that off-site drop boxes are therefore permissible. Secretary LaRose has nevertheless chosen to keep in place Directive 2020-16, which he issued August 12.

---

[1] For example, limiting "outside" collection solely to board premises also would seem to prohibit the Hamilton County board from deploying its staff on November 3 the way it deployed them on April 28, 2020, the last day of the primary election. The line of cars trying to reach the board of elections to deliver ballots stretched more than a mile onto the highway, so perhaps "outside" extends that far. Staff members went out with plastic trays to collect the ballots.

The Court has given the Secretary every opportunity to address the problem identified at the September 23 hearing, and he has been unwilling or unable to do so. At this late date, with voting already underway, the Court has no alternative but to address the constitutionality of Directive 2020-16, and any subsequent directives which emanate from it. The right to vote guaranteed by the First and Fourteenth Amendments is without question one of the most important rights guaranteed by our Constitution. The COVID-19 pandemic, coupled with the anxiety over whether the U.S. Postal Service will be able to handle the unprecedented number of ballots being returned by mail, is posing unprecedented challenges to voters and boards of election. Under these unprecedented circumstances, Plaintiffs have made a substantial showing that Secretary LaRose's prohibitions on off-site drop boxes and ballot delivery are unconstitutional, and Plaintiffs have demonstrated all the other conditions necessary to warrant the Court issuing a preliminary injunction.

## II.    Background and Procedural History

On August 26, 2020, Plaintiffs, who are non-partisan civil rights organizations and individual voters, filed this suit to challenge Defendant Ohio Secretary of State Frank LaRose's (the "Secretary") Directive 2020-16, which pertains to the use of secure drop boxes for the November 3, 2020 election. On September 4, 2020, Plaintiffs filed a motion for preliminary injunction asking the Court to enjoin enforcement of Directive 2020-16 to the extent that it would limit county boards of elections to a single ballot drop box at the board office. Doc #: 13.[2] The Secretary and Intervenors[3] filed briefs in opposition. Doc ##: 30, 31. Plaintiffs filed a reply. Doc

---

[2] Unless otherwise indicated, the Court uses the "Directive" throughout this Opinion to refer to the specific portion of Directive 2020-16 that Plaintiffs challenge.

[3] Intervenors are: Donald J. Trump for President, Inc., the Ohio Republican Party, the Republican National Committee, and the National Republican Congressional Committee.  Doc #: 27.

#: 34. On September 23 and 24, 2020, the Court held a hearing at which time the parties presented witnesses and other evidence.

On September 25, the Court issued an Order that addressed many of the background facts relevant to Plaintiffs' Motion. *See* Doc #: 77.[4] In that Order, the Court referred to the parallel state court litigation, where the trial court had enjoined the portion of the challenged Directive. *Id.* at 5–6. The Court stated that the resolution of the state court litigation might moot this case if the highest court to rule upheld the trial court's decision. *Id.* at 6. Because a federal court should address constitutional questions only as a last resort, this Court held in abeyance any ruling on Plaintiffs' Motion. *Id.* Because of the looming problem in Cuyahoga County identified at the hearing, the Court ordered the Secretary to work closely with the Cuyahoga County board to address the problem and ordered the Secretary to file a report on those efforts. *Id.* at 6–7.

On September 30, the Secretary filed his report, stating he had approved the portion of the Cuyahoga County board's plan to have board staff collect absentee ballots at a parking lot owned by the Cleveland Metropolitan School District that is one block away and across the street from the board office. Doc #: 79. The Secretary continued to prohibit the remaining portion of the plan, which would have permitted voters to deliver ballots to board staff at six public libraries throughout the county. *See* Doc #: 77 at 5. On October 2, the Court ordered the Secretary to explain why he was prohibiting board staff from receiving ballots at public libraries. *See* non-document Order (Oct. 2, 2020).

Later on October 2, the 10th District Court of Appeals upheld the state trial court's determination that the Secretary's interpretation of R.C. 3509.05 is not reasonable, and that the statute neither prohibits nor requires ballot drop boxes at locations other than the boards of

---

[4] Additional relevant facts will be discussed in the analysis below.

elections. *See Ohio Democratic Party et al. v. LaRose*, No. 20AP432 (Ohio Ct. App. Oct. 2, 2020). The Court of Appeals reversed the injunction, however, leaving in place the prohibition in Directive 2020-16 on drop boxes at locations other than board offices.

On October 5, the Secretary filed his response to the Court's October 2 Order and did not explain why he maintained the prohibition on the Cuyahoga board's plan, other than to say "nothing in Ohio law requires the Secretary to permit one county to provide more voting opportunities than are available in any other county." Doc #: 86 at 2. On that day, the Secretary also issued Directive 2020-22, which the Court interpreted to allow off-site staffed collection of ballots because it did not limit collection location as Directive 2020-16 limited drop box location. Based on that interpretation, the Court determined no board is being prohibited from doing anything it voted to do with respect to off-site collection of ballots, and therefore there was no problem an injunction would remedy. Accordingly, the Court dismissed the case without prejudice. Doc #: 88.

Plaintiffs now request reconsideration of the Opinion and Order dismissing the case because the Court incorrectly interpreted Directive 2020-22, and in fact the Secretary continues to limit off-site collection of ballots. On October 7, the Secretary notified the Cuyahoga County board via e-mail that the Court's interpretation was incorrect and the Cuyahoga County board is not authorized to receive ballots at six public libraries and other boards are not authorized to deploy staff to receive ballots off-site. Doc #: 89-5. Because the Secretary continues to prohibit certain off-site ballot collection, which is not prohibited under state law, the Court now considers Plaintiffs' claim that this prohibition is unconstitutional and must be enjoined.

### III.    Standard of Review

To be entitled to injunctive relief, Plaintiffs must show (1) they have a strong likelihood of success on the merits, (2) they would suffer irreparable harm absent the injunction, (3) issuance of the injunction would not cause substantial harm to others, and (4) the public interest would be served by issuance of an injunction. *See Leary v. Daeshner*, 228 F.3d 729, 736 (6th Cir. 2000); *see also Obama for Am. v. Husted*, 697 F.3d 423, 428 (6th Cir. 2012). "[T]he four considerations applicable to preliminary injunctions are factors to be balanced and not prerequisites that must be satisfied." *In re Eagle-Picher Indus., Inc*., 963 F.2d 855, 859 (6th Cir. 1992). "These factors simply guide the discretion of the court; they are not meant to be rigid and unbending requirements." *Id*.

### IV.    Analysis

Plaintiffs argue that the Directive violates: 1) their rights under the First and Fourteenth Amendments to the United States Constitution pursuant to *Anderson/Burdick*, and 2) their Equal Protection rights under the Fourteenth Amendment to the United States Constitution pursuant to *Bush v. Gore*. Before the Court considers the merits of these claims, it must address whether Plaintiffs have standing to sue.

#### A.  Standing

Whether a plaintiff has standing to bring suit is a "threshold question in every federal case." *Grendell v. Ohio Supreme Court*, 252 F.3d 828, 832 (6th Cir. 2001). "To establish standing, a plaintiff must show a concrete and particularized injury that is actual or imminent, a causal connection between the injury and the conduct complained of, and likelihood that a favorable decision will redress the injury." *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 624 (6th Cir. 2016) ("*NEOCH*"). At the preliminary injunction stage, plaintiffs must show they are likely to successfully prove standing. *See U.S. Student Ass'n Foundation v. Land*, 585 F. Supp. 2d

925, 942 (E.D. Mich. 2008). "When one party has standing to bring a claim, the identical claims brought by other parties to the same lawsuit are justiciable." *NEOCH*, 837 F.3d at 623–24 (citing *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 330 (1999)).

### 1.  Standing of Organizational Plaintiffs

The Organizational Plaintiffs are all non-partisan Ohio entities that, among other things, provide voter services and education. They claim the Directive has directly injured them because they "diverted limited resources, including staff and volunteer time, to fielding calls from members and chapter presidents about the Directive and how it will impact members." Doc #: 13 at 14.[5]

#### a.  Injury

"[A] drain on an organization's resources … constitutes a concrete and demonstrable injury for standing purposes." *Miami Valley Fair Hous. Ctr., Inc. v. Connor Grp.*, 725 F.3d 571, 576 (6th Cir. 2013) (organization alleged that it has had to "divert its resources, its staff time and energy" to addressing defendant's conduct).

Organizational Plaintiffs claim they are directly injured by the Directive because it has required them to divert resources to increased education and outreach efforts in response to the Directive. Doc #: 13 at 14; Doc #: 34 at 5. Their staff have fielded calls from members and constituents about ballot drop boxes, and they have had to pause other work critical to their organizations. Doc #: 34 at 5; Doc #: 83, September 23, 2020 Hr'g Tr. at 324:7–325:15. The Secretary asserts this is not a cognizable injury because drop boxes have never been used at locations other than boards of elections, and Organizational Plaintiffs merely are expending resources to tell voters their voting options have not changed. Doc #: 31 at 10–11. In contrast, if

---

[5] Plaintiffs asserted in the Motion that they also were suing on behalf of their members, but they did not reply to Defendant's arguments regarding associational standing or otherwise argue how they have satisfied that standard. Therefore, the Court concludes Plaintiffs have abandoned their associational standing argument.

every county has discretion to install a different number of drop boxes at a variety of locations, the Organizational Plaintiffs will have to divert resources and tailor its message to each of Ohio's 88 counties. *Id.* at 11.

The Secretary relies on the Sixth Circuit's decision in *Fair Elections Ohio v. Husted*, 770 F.3d 456, 459–60 (6th Cir. 2014), which determined that "it is not an injury to instruct election volunteers about absentee voting procedures when the volunteers are being trained in voting procedures already." There, the Court noted that Plaintiffs did not provide any evidence as to how the law at issue changed the organizations' activities. 770 F.3d at 459. In a later case, the Sixth Circuit distinguished the facts of *Fair Elections* and found an organizational plaintiff had standing, saying "[w]hereas the *Fair Election* (sic) plaintiff merely exhausted 'efforts and expense [in] advis[ing] others how to comport with' *existing* law, NEOCH has immediate plans to mobilize its limited resources to revise its voter-education and get-out-the-vote programs on account of [the change in law]." *NEOCH*, 837 F.3d at 624 (quoting *Fair Elections*, 770 F.3d at 460).

The Organizational Plaintiffs here are more like the plaintiff in *NEOCH* than in *Fair Elections*. In this unique election season, the Organizational Plaintiffs likely are expending their resources in ways they have never had to, including to educate the unprecedented number of absentee voters—whether they plan to deliver their ballots by mail or to a drop box—and to advise voters on COVID-19 restrictions in place at polling locations. But the Organizational Plaintiffs have put forward credible evidence that they have had to divert resources specifically because of the Directive. *See* Doc #: 83 at 313:5–314:10, 324:7–325:15; Doc #: 68, Roberts Dep. at 10:14–11:11; Doc #: 69, Washington Dep. at 19:1-17, 21:5-23:6. Accordingly, Organizational Plaintiffs have demonstrated they are likely to succeed in showing an injury due to the Directive.

b. <u>Causation</u>

Plaintiffs plainly explain how their injury is caused by the Directive. *See* Doc #: 13 at 8–9 (addressing "The Effect of the Directive"). The Secretary mistakenly relies on *Thompson v. DeWine* in support of his argument that Plaintiffs are claiming their rights are being violated due to factors that are not attributable to Secretary LaRose. First, the conclusion the Secretary relies on pertains to the merits of the *Thompson* plaintiffs' claim, which the Sixth Circuit would not have reached if it determined plaintiffs lacked standing. Second, the Court in *Thompson* considered whether Ohio's *preexisting* ballot initiative requirements burdened plaintiffs' First Amendment Rights in the context of COVID-19 and attendant restrictions. 959 F.3d 804, 809 (6th Cir. 2020). But because Ohio's COVID-19 restrictions exempted First Amendment protected activity, the Court's conclusion that there was no "state action" and the State was likely to prevail on the merits rested on a determination that "none of Ohio's pandemic response regulations changed the status quo of the activities Plaintiffs could engage in." *Id.* To the contrary, here, the Secretary implemented a new prohibition via the Directive. Thus, Plaintiffs' alleged injuries are fairly traceable to the Secretary.

c. <u>Redressability</u>

Plaintiffs seek an injunction prohibiting the Secretary from enforcing the Directive's limitation on ballot drop boxes to one location per county. An injunction will allow them to continue to allocate resources as they intended prior to the Secretary's issuance of the Directive. Contrary to the Secretary's and Intervenors' arguments that Plaintiffs' claims rest on speculation that the boards of elections will act, Plaintiffs have shown that if a Court enjoins the Directive's limitation on drop boxes at locations other than the board of elections, at least one board will act to allow multiple delivery locations. *See* Doc #: 83 at 105–08, 162–65. Further, by arguing that the

10

relief Plaintiffs seek will result in spin-off litigation,[6] the Secretary implicitly acknowledges that county boards of elections will authorize multiple drop box locations if permitted to do so.

For all these reasons, Organizational Plaintiffs have demonstrated a substantial likelihood of proving standing.

### 2. Standing of Individual Plaintiffs

The Individual Plaintiffs are voters that intend to use ballot drop boxes to submit their absentee ballots. Doc #: 13.

### a. Injury

Individual Plaintiffs claim that the prohibition on multiple drop box locations imposes a burden on their right to vote. In support, they provide several reasons why they intend to vote by returning absentee ballots to drop boxes rather than voting in person or by mailing their ballots, and the burden of having only one delivery location per county. *See, e.g.*, Doc #: 13-14, Connally Decl. at ¶¶ 4–7; Doc #: 57, Connally Dep. at 5:20–8:6; Doc #: 13-17, Rikleen Decl. at ¶¶ 10–13; Doc #: 67, Rikleen Dep. at 11:5–19; Doc #: 60, Griffin Dep. at 9:19–13:21. The Court finds that at least one Individual Plaintiff, C. Ellen Connally, has shown a likelihood of proving an injury.

The Secretary suggests Plaintiffs are not injured by the prohibition because they "have so many other available voting options that they are simply rejecting." Doc #: 31 at 7. The Secretary's attempts to diminish Plaintiffs' injuries are unavailing. First, the Secretary states Plaintiffs do not want to mail their ballots because they "subjectively fear" the USPS. *Id.* The concerns about USPS are not only legitimized by the organization itself,[7] but by two federal courts[8] and the Secretary

---

[6] Plaintiffs have represented to the Court that they do not intend to sue individual counties if the county boards of election do not install more than one drop box for the November 3, 2020 election. Doc #: 17 at 3.

[7] *See* Doc #: 13-3, Ditchey Decl, Ex. C.

[8] *Washington v. Trump et al.*, 2020 WL 5568557 (E.D. Wash. Sept. 17, 2020); *Jones v. United States Postal Serv.*, No. 20cv6516, Doc #: 49 (S.D.N.Y. Sept. 21, 2020).

himself. The Secretary recently said he is "cautiously optimistic" that the USPS can handle the higher-than-usual volume of mail ballots,[9] which is hardly a ringing endorsement.[10] Similarly, the Secretary minimizes another of Plaintiffs' concerns that he has acknowledged by next claiming Plaintiffs "don't want to vote at their precinct on Election Day" and omitting the legitimate reason for this preference: the risk of contracting COVID-19. *See* Doc #: 31 at 7. But the Secretary has recognized Ohioans "mustn't be forced to choose between their health and exercising their constitutional rights." *See* Doc #: 13 at 2–3. Continuing, the Secretary claims Plaintiffs "don't want to travel to the board of elections because it might be a far drive." Doc #: 31 at 7. This assertion assumes all Plaintiffs and Ohio voters have access to a car, and it dismisses the risks of a long trip on public transportation during a pandemic. *E.g.*, Doc #: 13-11, Jesionowski Decl. at ¶ 7. Finally, the Secretary argues Plaintiffs do not want to use the drop box located at the board of elections because they "think that the line *might* be long" on Election Day. Doc #: 31 at 7–8 (emphasis added). The Secretary does nothing to refute Plaintiffs' proof—which the Court credits—that the lines in certain counties almost certainly *will* be long enough that some voters likely will walk away from the chaos and lose their vote. *See* Doc #: 83 at 288–90, 298–99.

b.  Causation & Redressability

For the reasons previously stated regarding Organizational Plaintiffs, the Individuals Plaintiffs have established the Directive caused their alleged injury and the injunction they seek is likely to redress the injury.

---

[9] Kenneth P. Vogel et al., *Postal Service and Officials Feud Over Mail Voting as Election Looms*, N.Y. Times (Sept. 16, 2020), https://www.nytimes.com/2020/09/16/us/politics/postal-service-mail-voting.html.
[10] During the primary, LaRose similarly expressed concern that voters would be prevented from casting a ballot because mail was taking as long as 7 to 9 days to delivered. *See* Memorandum from Frank LaRose to Ohio Congressional Delegation at 1 (Apr. 23, 2020), https://www.ohiosos.gov/globalassets/media-center/news/2020/2020-04-24.pdf.

### B.  Statutory Construction

The issue of whether Ohio law prohibits off-site delivery of ballots has now been resolved by parallel litigation in state court. Judge Frye of the Franklin County Court of Common Pleas ruled on September 15 that Ohio statutes do not prohibit off-site drop boxes. He held further that Directive 2020-16 was arbitrary and unreasonable, and he enjoined enforcement of the Directive. *Ohio Democratic Party, et al. v. Frank LaRose, Secretary of State, et al.*, Case No. 20 CV 5634, (Franklin Cty. Common Pleas Ct. Sept. 15, 2020). The Secretary appealed Judge Frye's ruling, and on October 2, the 10th District Court of Appeals upheld Judge Frye's holding that Ohio law does not prohibit multiple drop boxes. All three courts to have considered the matter have rejected the Secretary's interpretation of R.C. 3509.05. It is now settled law that off-site drop boxes are neither prohibited nor compelled in Ohio. The Court of Appeals reversed the injunction, however, leaving the limitation on multiple drop boxes in place. Secretary LaRose has not repealed the Directive and he is still prohibiting off-site drop boxes and staff collection.

### C.  Constitutional Claims

The Constitution gives states primary responsibility for establishing the "[t]imes, Places and Manner of holding Elections for Senators and Representatives," subject to congressional modification. U.S. Const. Art. I, § 4, Cl. 1; *see also id.* Art. II, § 1, Cls. 2, 4. However, it is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights. *See Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick v. Takushi*, 504 U.S. 428 (1992).

The state's procedures must be fair.  *See Dunn v. Blumstein*, 405 U.S. 330, 336 (1972) ("[a] citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction."); *see also Bush v. Gore,* 531 U.S. 98, 104–05 (2000). They must not place any burden upon voting beyond what is necessary to ensure a fair election, and they may not

impose an undue burden upon any suspect class of citizens. *See Wesberry v. Sanders*, 376 U.S. 1, 17 (1964) ("Our Constitution leaves no room for classification of people in a way that unnecessarily abridges [the right to vote.]"). Even facially neutral procedures may have a disparate adverse impact upon certain groups of voters. And that impact must be analyzed in the context of the unprecedented conditions surrounding the November 3, 2020 election.

    1.  **Likelihood of Success on the Merits**

        a.  <u>First and Fourteenth Amendments to the United States Constitution pursuant to *Anderson/Burdick*</u>

As the parties correctly noted, Plaintiffs' challenge to the Directive is governed by the *Anderson-Burdick* framework. To determine whether a state election regulation burdens plaintiffs' right under the constitution, "a court, 'must weigh the character and magnitude of the asserted injury' to the plaintiffs' rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights." *Anderson*, 460 U.S. at 789; *Burdick*, 504 U.S. at 434.

Under the *Anderson-Burdick* framework, "[w]hen those rights are subjected to 'severe' restrictions, the regulation is subject to strict scrutiny and must be 'narrowly drawn to advance a state interest of compelling importance.'" *Burdick*, 504 U.S. at 434 (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)). But when those rights are subjected only to "reasonable, nondiscriminatory restrictions," the regulation is subject to rational-basis review because "the State's important regulatory interests are generally sufficient to justify" the restriction. *Id*. (quoting *Anderson*, 460 U.S. at 788). However, it is when cases fall between these two extremes – strict scrutiny and rational basis – that the *Anderson-Burdick* framework abandons the traditional tiers of scrutiny. *See Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789) ("For cases between these

extremes, we weigh the burden imposed by the State's regulation against 'the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights.'"); *see also Obama for Am. v. Husted*, 697 F.3d 423, 429 (6th Cir. 2012) ("When a plaintiff alleges that a state has burdened voting rights through the disparate treatment of voters, we review the claim using the 'flexible standard' outlined in [*Anderson* and *Burdick*]; *See Hunter*, 635 F.3d at 238 (applying *Anderson-Burdick* balancing in an equal protection challenge to the counting of provisional ballots).").

The Supreme Court has confirmed *Anderson* and *Burdick* vitality in a much broader range of voting rights contexts. *See Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 204 (Scalia, J., concurring) ("To evaluate a law respecting the right to vote—whether it governs voter qualifications, candidate selection, or the voting process—we use the approach set out in Burdick . . . ."); *see also Thompson*, 959 F.3d at 808 (quoting *Burdick*, 504 U.S. at 434 (internal quotation marks omitted)).

"This standard is sufficiently flexible to accommodate the complexities of state election regulations while also protecting the fundamental importance of the right to vote. There is no 'litmus test' to separate valid from invalid voting regulations; courts must weigh the burden on voters against the state's asserted justifications and make the hard judgment that the adversary system demands." *Obama for Am.*, 697 F.3d at 430 (internal citations omitted). First, the Court will determine the burden that the Directive imposes on Plaintiffs' rights under the First and Fourteenth Amendments.

i.    Anderson-Burdick *Step one – The Burden*

Plaintiffs allege that the Directive violates their rights under the First and Fourteenth Amendments to the United States Constitution by imposing burdens on their voting rights and does so arbitrarily and disproportionately based on a voter's county of residence. Specifically, Plaintiffs assert that the Directive, by limiting a county to a single drop box location, with no regard for its population, significantly burdens a large number of voters – especially those who are low-income minorities and reside in larger counties and cities. Further, Plaintiff asserts that the prohibition of multiple drop box locations causes voters from larger counties to spend an unreasonable amount of time traveling to the single drop box at the boards – ultimately causing voters to forgo their right to vote or spend a great amount of time in long lines leading to a form of voter suppression.

In response, the Secretary takes the position that "the Directive does not burden anything," rather it expands the right to vote. Doc #: 31 at 13. The Secretary contends that, at most, the burden is light, and it implements a reasonable, non-discriminatory standard that is entitled to rational basis scrutiny. *Id*. The Secretary notes that prior to the Directive, counties were free to remove existing drop boxes and not use them at all for the November 2020 general election. *Id*. The Intervenors take a similar position and note that inconvenience is not a substantial burden. Doc #: 30 at 7–8.

The Court finds both the Secretary's and Intervenors' arguments to be unpersuasive. The Secretary attempts to minimize the burden that Plaintiffs assert by highlighting that voters are given two options to return completed absentee ballots: 1) US mail or 2) personal delivery to the board of elections. However, the Secretary and Intervenors gloss over the risks and obstacles that those options present under today's unprecedented conditions.

The Court credits Plaintiffs' argument that the Directive particularly burdens the right to vote of Ohio residents who are poor and people of color. Doc #: 13 at 1–2; Doc #: 13-3, Chatman Decl. at ¶ 37. Further, it is indisputable that the pandemic has had a particularly devasting impact upon Americans of color. By recent government count, COVID-19 has already infected over 7.5 million Americans and claimed over 211,132 lives.[11] Voters' fears of voting in-person due to COVID-19 are reasonable, and no one can rationally discount those fears. *See Adams & Boyle, P.C. v. Slatery*, 956 F.3d 913, 928 (6th Cir. 2020) ("[w]e cannot gainsay the threat posed by COVID-19; as we stated at the outset of the opinion, these are extraordinary times calling for extraordinary measures.").

It is also indisputable that we are living in the unprecedented juxtaposition of the worst pandemic in a century coupled with reasonable concern and anxiety over the ability of the U.S. Postal Service to handle what will undoubtedly be the largest number of absentee voters in Ohio's history, both by absolute number and percentage. This is the case even though Ohio permits a ballot that is postmarked by the day before the election (November 2 this year) to be counted if it is received by the board of elections by the 10th day after the election (November 13 this year).  In past years, the overwhelming majority of citizens who voted absentee returned their ballots by mail. As of September 22, 2020, at least 1.8 million Ohioans have requested absentee ballots for the November 3, 2020 election.[12] This year, the drastic procedural changes recently implemented by the Postal Service and the resulting disruption and delay in delivery has created reasonable anxiety over the ability of the Postal Service to get ballots delivered to voters in a timely fashion,

---

[11] Centers for Disease Control and Prevention, CDC COVID Data Tracker, https://covid.cdc.gov/covid-data-tracker/#cases_casesinlast7days (last accessed Oct. 8, 2020).
[12] Secretary Larose Announces Nearly 1.8 Million Absentee Ballot Applications Received, https://www.ohiosos.gov/media-center/press-releases/2020/2020-09-22/ (last visited October 8, 2020).

and then to deliver those ballots to the Board of Elections in each county.[13] The obstacles that voters face if they chose to vote by mail is evident by the fact that, as stated above, two federal judges have recently enjoined the U.S. Postal Service from implementing procedural changes which they found would adversely impact the delivery of ballots leading to disenfranchisement.[14]

Plaintiffs introduced testimony that approximately 15% of Cincinnati and Cleveland's voting population (who are primarily poor and person of color), will have to travel more than 90 minutes to and from their single drop box location. Doc #: 13-3, Chatman Decl. at ¶¶ 48, 78; Doc #: 83 at 115, 262–64. Neither Defendant nor Intervenors presented any contradictory evidence. The Court credits the testimony of board member Inajo Chappell and expert witness Dr. Daniel Chatman that predicted the massive traffic jam and delay will likely lead to many voters giving up and losing their ability to vote. *Purcell*, 549 U.S. at 4 ("[T]he possibility that qualified voters might be turned away from the polls would caution any district judge to give careful consideration to the plaintiffs' challenges."). The Secretary's permission to Cuyahoga County board of elections to have staff members accept ballots adjacent a block away from the board's office does not solve the core burden here – that many Cuyahoga voters still have to travel more than 90 minutes round trip to deliver their ballot. This is particularly true when there is evidence that many urban voters lack access to a vehicle, which is strongly correlated with low-income status. *See* Doc #: 83 at 262–64.

---

[13]  *See* New York Times, Postal Crisis Ripples Across Nation as Election Looms, https://www.nytimes.com/2020/08/15/us/post-office-vote-by-mail.html (last updated Aug 18, 2020 ); *see also* Cleveland, Ohio among states warned by U.S. Postal Service that mail-voting deadlines could disenfranchise voters, https://www.cleveland.com/open/2020/08/ohio-among-states-warned-by-us-postal-service-that-mail-deadlines-could-disenfranchise-voters.html (published Aug. 14, 2020).
[14] *See Washington*, 2020 U.S. Dist. LEXIS 171873, *15; *See generally Jones,* 2020 U.S. Dist. LEXIS 172430, *38.

The burden that the Directive imposes on large counties is exhibited by the fact that Cuyahoga County attempted to create alternative ways to ease its burden.[15] *Id*. at 132–33. While it may be said that the 7,903 registered voters in Noble County may find a single drop box location sufficient, the record demonstrates that the 858,041 registered voters in Cuyahoga County will likely not. Moreover, the undisputed facts surrounding the primary election on April 28, 2020 also reveals the burden that large counties face with a single drop box location: Hamilton board of election had

> "long lines of cars waiting on [the] highway late in the afternoon that day trying to get to that [single] drop box. There's been lines extending as long as a mile out onto both directions of that four[-]lane highway. And that was with only roughly 100,000 people voting by mail or absentee in the primary…. [m]y concern is that if we have that same kind of situation arise, particularly on Election Day on November 3, we could very well get to 7:30 with lines extending out onto that highway who knows how far. How do we mark the end of those lines and make sure that the people who are waiting in that line are able to deliver their ballot?" "[w]e [] mark[ed] the end of the line. And at that point what we did was send teams of a Democrat and Republican out with basically plastic mail trays, and we collected the ballots from the drivers in those cars directly into those trays. The ballots never made it to the drop box."

*Id.* at 149–53.

What occurred at the Hamilton board of elections during the April 28, 2020 primary election, and what will likely occur in Cuyahoga County on November 3 based on Dr. Daniel Chatman's testimony, cannot be termed a mere inconvenience, especially during these times. *Adams & Boyle, P.C.*, 956 F.3d at 925 ("we are not living in normal times; we are living in pandemic times."). Allowing voters to deliver their ballots down the street will not likely cure the problem. The Directive deprives a significant number of Ohio voters of ready access to a drop box and creates a strong likelihood of disenfranchisement. As stated in *United States v. Mosley*, 238

---

[15] Cleveland, Ohio Secretary of State Frank LaRose blocks Cuyahoga County elections plan offering ballot drop-off sites at libraries, https://www.cleveland.com/open/2020/09/ohio-secretary-of-state-frank-larose-blocks-cuyahoga-county-elections-plan-offering-ballot-drop-off-sites-at-libraries.html (published Sept 14, 2020).

U.S. 383, 386 (1915), "the right to have one's vote counted" has the same dignity as "the right to put a ballot in a box."

Although it is impossible to know how many people may lose their right to vote because of the Directive, the question is whether the Directive imposes a burden on the fundamental right to vote. Accordingly, after reviewing the briefs and testimony in the record, the Court holds that the Directive significantly burdens the right to vote, and, ultimately, may have the effect of deterring many people from voting or forcing them to risk their health by voting in-person.

Based on the above reasons, the Court finds that the combination of the Directive limiting counties to a single drop box location and the disproportionate effect it has on people of color living in larger counties and cities imposes a significant burden on Plaintiffs' fundamental right to vote, and so intermediate scrutiny applies. Accordingly, this Court must now balance the burden imposed against the state interest the Secretary contends are served by the Directive.

> ii.     Anderson-Burdick *step two – Whether the State's Justification Outweighs the Burden*

Turning to the Defendant's justifications, Secretary LaRose asserts two justifications for restricting counties to one drop box location in its Directive: 1) giving each voter the same opportunity to securely cast a ballot; and 2) the risk of fraud posed by multiple drop boxes.

The Court is unpersuaded by the Secretary's first justification for multiple reasons. Secretary LaRose contends that the Directive is necessary to ensure that all Ohioans have the same opportunity to securely cast their votes in drop boxes. *See* Doc #: 31 at 13. The problem with this rationale is that all counties are not equal in population or in geographic size. Giving all voters an equal opportunity would require multiple drop boxes in heavily populated counties to account for their population. The federal guidelines in fact call for one drop box for every 15,000–20,000

voters.[16] The Secretary offers the rationale that the prohibition promotes uniformity. *See* Doc #: 83 at 332. However, uniformity without a valid underlying reason for the chosen rule is not a justification. *See Obama for Am.*, 697 F.3d at 442. While voters have no right to a drop box, "[h]aving once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Id.* at 428 (other citations omitted).

Also, there is no evidence in the record that suggests that multiple drop boxes cannot be as secure as the single drop box required at each board of elections. Any drop box location can be monitored 24/7, and the boards can use the same bi-partisan protocol currently in place for the drop box at the board. By placing any additional drop boxes on public property, no board would need to address the leasing issues that Deputy Assistant Secretary Amanda Grandjean cited in her testimony. *See* Doc #: 83 at 348–49.

It is even easier to reject the Secretary's second justification. No evidence was introduced at the hearing to support the conclusory reference to fraud in the Secretary's brief. *See* Doc #: 31 at 14.

The Secretary's justifications for the Directive are further undercut by his own recent public statements that his preference was for multiple drop boxes, assuming they were permitted under the law or ordered by a court. Specifically, in late August, the Secretary stated "I think it would be a great thing if we could if the state legislature were to authorize it, or a judge's order. I would be happy to see more drop boxes in more places throughout the state. As long as it had the

---

[16] U.S. Election Assistance Commission,
https://www.eac.gov/sites/default/files/electionofficials/vbm/Ballot_Drop_Box.pdf.

bipartisan support of those boards of elections, and as long as those drop boxes were secure and under video surveillance."[17] The Secretary said nothing about uniformity, security, or fraud.

As the Court has noted above, under *Anderson/Burdick*, the Secretary must show a state interest in prohibiting off-site drop boxes sufficient to counterbalance the burden the Directive imposes upon voting rights. Applying intermediate scrutiny, it is not even a close question. In fact, the Secretary has not produced sufficient evidence to support the Directive even under rational basis analysis. Accordingly, the Court finds that Plaintiffs are likely to succeed on their claims that the Directive violates their rights under the First and Fourteenth Amendments to the United States Constitution pursuant to *Anderson/Burdick*.[18]

### 2.  Likelihood That Plaintiff Will Suffer Irreparable Harm Absent Injunctive Relief

The Court must evaluate whether Plaintiffs will suffer irreparable harm in the absence of injunctive relief. The record reflects that, absent injunctive relief, registered voters who reside in larger counties will be forced to spend an unreasonable amount of time traveling to a single drop box location at the board – ultimately 1) leading voters to forgo their fundamental right to vote or 2) substantially burdening voters with long commutes and long lines leading to a form of voter suppression. Voting began on October 6, and absent injunctive relief, registered voters will be deprived of a fair election.

---

[17]  21 WFMJ, Secretary of state answers questions about more secure ballot drop boxes, https://www.wfmj.com/story/42564719/secretary-of-state-answers-questions-about-more-secure-ballot-drop-boxes-warren-oh (published Aug. 30, 2020).

[18] Plaintiffs also challenge the Directive under the Equal Protection Clause of the Fourteenth Amendment pursuant to *Bush v. Gore*, 531 U.S. 98 (2000). However, the Court finds that *Bush v. Gore* does not apply. In *Bush v. Gore*, the Supreme Court concluded that the "intent of the voter" standard for determining what was a legal vote was being implemented differently by different counties in Florida with respect to the same presidential election. *Bush v. Gore*, 531 U.S. at 105–07. Unlike in *Bush v. Gore*, there are no inter-jurisdictional differences in how the standards in the Directive are implemented. The Directive requires each county to maintain a single drop box at the board office, to monitor drop boxes 24/7, and to have at least one Republican and one Democratic member of the board or broad staff together retrieve the drop box's contents at least once daily.

It is well established in the Sixth Circuit that when constitutional rights are threatened or impaired, irreparable injury is presumed. *See Obama for Am.*, 697 F.3d at 436 (other citations omitted). As stated above, the Court finds that Plaintiffs' constitutional rights under the First and Fourteenth Amendments are threatened. Therefore, Plaintiffs will suffer irreparable injury in the absence of preliminary injunctive relief.

### 3.  Harm to Third Parties

The Secretary contended that granting a preliminary injunction at this stage may result in voter confusion. At the September 23, 2020 hearing, the Secretary's counsel testified that there are several cities, including Columbus and Cincinnati, which are in more than one county ("straddled counties"). *See* Doc # 83 at 56–57. Specifically, the Secretary's Counsel stated that, due to straddled counties, some city voters could mistakenly place their ballot in the wrong county's off-site drop box if additional drop boxes are installed near county borders. *Id*. However, this is not a serious concern. First, no board is likely to put a ballot box near a county border. Second, there is no evidence in the record that this would cause any confusion or return of ballots to an incorrect location. Third, while there are no directives in place to cover what happens to ballots that are placed in the wrong drop box, several board witnesses stated, boards as a routine practice simply deliver the ballot to the correct county. *Id.* at 130–31, 203–04. Thus, so long as this occurred before the polls close on election day, the ballot would be counted.

As voting is just beginning, any board that wants to use off-site drop boxes for off-site ballot delivery has time to use print, electronic, and social media to get this information to the public. As Cuyahoga County board member Inajo Chappell testified, the boards are fully capable of disseminating information to registered voters as they utilize several platforms such as social media and their list server to communicate with registered voters in their respective communities.

*Id.* at 243–44. Accordingly, the Court finds that there will be no harm to the boards or residents if the Court grants Plaintiffs' preliminary injunction.

### 4.  Whether the Public Interest Would Be Served By Issuance Of The Injunction

"While states have a strong interest in their ability to enforce state election law requirements, *Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 244 (6th Cir. 2011), the public has a 'strong interest in exercising the 'fundamental political right' to vote." *Purcell*, 549 U.S. at 4 (quoting *Dunn*, 405 U.S. at 336).

The Secretary asserts that the public interest factors do not favor altering the election process in weeks leading up to an election. In stating its position, the Secretary relies heavily on *Purcell v. Gonzalez*, but to no avail. In *Purcell v. Gonzalez*, the Supreme Court vacated an injunction preventing Arizona's voter identification laws from taking effect. *Purcell*, 549 U.S. at 6. However, this case is distinguishable and does not apply to the facts present in this instant case. In *Purcell v. Gonzalez*, after delaying for three months, the district court denied plaintiff's request for a preliminary injunction, without issuing findings of fact or conclusions of law. *Id*. The plaintiffs appealed the denial, and a briefing schedule was set that concluded on November 21, two weeks after the upcoming November 7 election. *Id*. The Ninth Circuit then issued a four-sentence order enjoying Arizona's voter identification law – creating a conflicting order with the district court. The Supreme Court vacated the Ninth Circuit order and found that "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls." *Id*. at 4–5. In doing so, the Supreme Court expressed the necessity for the court of appeals to give deference to the discretion of the district court. *Id*. at 5.

24

In the instant case, granting Plaintiffs' preliminary injunction would not disrupt the State's election process – rather, it would end the disruption and litigation around the use of multiple drop boxes locations. It is clear from the record that at least one county board, Cuyahoga, was discussing installing multiple drop boxes locations, prior to the Directive. As an alternative, the board voted 4-0 to place staff at several public libraries to receive ballots, but the Secretary has prevented them from doing so. Consequently, granting an injunction would permit other boards to consider implementing off-site delivery. *Obama for Am.*, 697 F.3d at 436–37 ("[t]he public interest therefore favors permitting as many qualified voters to vote as possible."). Providing accessibility to voting by providing more than one drop box location will enhance "[c]onfidence in the integrity of our electoral processes [, which] is essential to the functioning of our participatory democracy." *Purcell*, 549 U.S. at 4.

## V.     Conclusion

Accordingly, the Plaintiffs' Motion for Reconsideration, Doc #: 89, is **GRANTED**. The Court re-opens the case, and the Plaintiffs' Motion for Preliminary Injunction, Doc #: 13, is **GRANTED**. The Secretary is enjoined from enforcing that portion of Directive 2020-16 that prohibits a county board of elections from installing a secure drop box at a location other than the board of elections office, and the Secretary is also enjoined from prohibiting a board from deploying its staff for off-site ballot delivery. Any board that votes to allow off-site drop boxes and/or ballot collection should adhere to the safety and security procedures prescribed by the Secretary in Section II of Directive 2020-22.

During the September 23–24 hearing, the Secretary requested that, if the Court granted a preliminary injunction, the Court should stay the injunction pending an appeal. The Court will not issue a stay. As stated above, we are in the middle of the worst pandemic in a century coupled with

reasonable concern over the ability of the U.S. Postal Service to handle what will undoubtedly be the largest number of absentee voters in Ohio's history. The Secretary has not advanced any legitimate reason to prohibit a county board of elections from utilizing off-site drop boxes and/or off-site delivery of ballots to staff. Voting began October 6, the Cuyahoga County board voted to begin collecting ballots at public libraries on October 13, other county boards may now vote to implement plans for off-site collection, and it is time for this litigation to end.


**IT IS SO ORDERED.**

**/s/ Dan Aaron Polster  October 8, 2020**
 **DAN AARON POLSTER**
 **UNITED STATES DISTRICT JUDGE**